No. 26-1713

# In the United States Court of Appeals for the First Circuit

ActBlue LLC; ActBlue Civics, Inc.; ATS, Inc.; ActBlue Charities, Inc.,

Plaintiffs–Appellees,

v.

Warren Kenneth Paxton, Jr., in his official capacity as Attorney General of the State of Texas,

Defendant–Appellant.

On Appeal from the United States District Court for the District of Massachusetts

## APPELLANT'S OPENING BRIEF ON THE MERITS

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

William R. Peterson
Solicitor General
William.Peterson@oag.texas.gov

William F. Cole
Principal Deputy Solicitor General

Nathaniel A. Plemons
Assistant Solicitor General

*Counsel for Defendant-Appellant*

# Table of Contents

Page

Table of Authorities ........ iii

Reasons Why Oral Argument Should Be Heard ........ x

Introduction ........ 1

Jurisdictional Statement ........ 3

Statement of the Issues ........ 4

Statement of the Case ........ 5

Summary of the Argument ........ 12

Standard of Review ........ 14

Argument ........ 15

I. *Younger v. Harris* Required the District Court To Abstain. ........ 16

A. *Younger*'s bad-faith exception applies only to repeated failed proceedings. ........ 18

B. *Younger*'s bad-faith exception requires that the state-court proceeding be "without hope" of success. ........ 22

C. There is no *Younger* irreparable injury. ........ 27

D. The district court's findings about subjective bad-faith are irrelevant and incorrect. ........ 28

II. The District Court Did Not Have Personal Jurisdiction Over the Texas Attorney General. ........ 33

A. ActBlue's claim does not arise out of any activities of the Texas Attorney General in Massachusetts. ........ 34

B. The Texas Attorney General did not purposefully avail himself of a Massachusetts forum. ........ 36

C. Exercising jurisdiction in Massachusetts is unreasonable. ........ 38

III. Venue Is Improper in Massachusetts. ........ 40

IV. The District Court Erred in Entering a Preliminary Injunction. ........ 41

A. ActBlue is unlikely to succeed on the merits of its claims. ........ 41

1. The *Hartman* and *Nieves* framework should govern the Attorney General's civil enforcement of the DTPA. ........ 42

2. The district court's findings are erroneous. ........ 43

3. The district court misapplied *Mt. Healthy* and wrongly rejected the Attorney General's defense. .... 45
B. ActBlue will not be irreparably harmed without the injunction. .... 47
C. The remaining equitable factors weigh against ActBlue. .... 48
Conclusion and Prayer .... 49
Certificate of Compliance .... 50
Certificate of Service .... 51

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*A Corp. v. All Am. Plumbing, Inc.*,
812 F.3d 54 (1st Cir. 2016) ........................................................................*passim*

*Am. Acad. of Pediatrics v. Uthmeier*,
178 F.4th 1113 (7th Cir. 2026),
*op. vacated, reh'g en banc granted* 180 F.4th 1022 (7th Cir. 2026) .......................19

*Am. Acad. of Pediatrics v. Uthmeier*,
2026 WL 1552734 (N.D. Ill. June 2, 2026)................................................... 21

*Am. Acad. of Pediatrics v. Uthmeier*,
No. 26-2238 (7th Cir. 2026)......................................................................... 12

*Arkebauer v. Kiley*,
985 F.2d 1351 (7th Cir. 1993) ........................................................................22

*Atl. Marine Constr. Co. v. U.S. Dist. Ct.*,
571 U.S. 49 (2013) ................................................................................ 40, 41

*Bello-Reyes v. Gaynor*,
985 F.3d 696 (9th Cir. 2021) ........................................................................ 43

*Bleiweiss v. Panduit Sales Corp.*,
No. CIV.A. H-13-0080, 2015 WL 163819 (S.D. Tex. Jan. 13, 2015).................. 30

*Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*,
622 F.3d 36 (1st Cir. 2010)............................................................................ 14

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ...................................................................................... 37

*In re Connetics Corp. Sec. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008) ............................................................ 29

*Cruz v. Melecio*,
204 F.3d 14 (1st Cir. 2000) ............................................................................16

*Daves v. Dallas County*,
64 F.4th 616 (5th Cir. 2023) (en banc) ............................................................16

*DeMartini v. Town of Gulf Stream*,
942 F.3d 1277 (11th Cir. 2019) ................................................................ 42, 43

*Doe v. Boys Clubs of Greater Dall., Inc.*,
907 S.W.2d 472 (Tex. 1995) ........ 24

*Dombrowski v. Pfister*,
380 U.S. 479 (1965) ........ 18, 19

*D.B. ex rel. Elizabeth B. v. Esposito*,
675 F.3d 26 (1st Cir. 2012) ........ 41, 42

*Esso Standard Oil Co. v. Cotto*,
389 F.3d 212 (1st Cir. 2004) ........ 14

*Frost v. Nessel*,
712 F. Supp. 3d 1008 (W.D. Mich. 2024),
*aff'd*, No. 24-1132, 2025 WL 1136288 (6th Cir. Apr. 17, 2025) ........ 27

*Garber v. Lego*,
11 F.3d 1197 (3d Cir. 1993) ........ 29

*Gates v. Strain*,
885 F.3d 874 (5th Cir. 2018) ........ 19

*Gattineri v. Town of Lynnfield*,
58 F.4th 512 (1st Cir. 2023) ........ 43

*Grandco Corp. v. Rochford*,
536 F.2d 197 (7th Cir. 1976) ........ 19-20

*Harlow v. Children's Hosp.*,
432 F.3d 50 (1st Cir. 2005) ........ 38

*Hartman v. Moore*,
547 U.S. 250 (2006) ........ 42

*Holzman v. State*,
No. 13-11-00168-CV, 2013 WL 398935 (Tex. App. 2013) ........ 23

*Ins. Co. of N. Am. v. Marina Salina Cruz*,
649 F.2d 1266 (9th Cir. 1981) ........ 39

*Jean v. Mass. State Police*,
492 F.3d 24 (1st Cir. 2007) ........ 15, 48

*John Crane, Inc. v. Shein L. Ctr., Ltd.*,
891 F.3d 692 (7th Cir. 2018) ........ 34, 37

*Jolt Initiative, Inc. v. Paxton*,
821 F. Supp. 3d 706 (W.D. Tex. 2026) ........ 20, 21

*In re Justs. of Super. Ct. Dep't of Mass. Trial Ct.*,
218 F.3d 11 (1st Cir. 2000) ....................16

*Kelter v. Associated Fin. Grp., Inc.*,
382 F. App'x 632 (9th Cir. 2010) .................... 29

*Ken-N.K., Inc. v. Vernon Twp.*,
18 F. App'x 319 (6th Cir. 2001) ....................19, 22

*Klen v. City of Loveland*,
661 F.3d 498 (10th Cir. 2011) .................... 46

*Knox v. MetalForming, Inc.*,
914 F.3d 685 (1st Cir. 2019) .................... 14

*Leroy v. Great W. United Corp.*,
443 U.S. 173 (1979) .................... 39

*Lewis v. Curtis*,
671 F.2d 779 (3d Cir. 1982) .................... 29, 30

*Maryland v. King*,
567 U.S. 1301 (2012) .................... 48, 49

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)....................15

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000).................... 29

*Media Matters for Am. v. Paxton*,
732 F. Supp. 3d 1 (D.D.C. 2024),
*aff'd*, 138 F.4th 563 (D.C. Cir. 2025) .................... 21

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*,
457 U.S. 423 (1982)....................17

*Mt. Healthy City Sch.Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977)....................*passim*

*Nader v. Keith*,
385 F.3d 729 (7th Cir. 2004) ....................16

*Netflix, Inc. v. Babin*,
88 F.4th 1080 (5th Cir. 2023) .................... 20, 22

*Nieves v. Bartlett*,
587 U.S. 391 (2019) ....................*passim*

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................ 15, 48

*Nowak v. Tak How Invs., Ltd.*,
94 F.3d 708 (1st Cir. 1996) ............................................................ 34

*Perez v. Ledesma*,
401 U.S. 82 (1971) ............................................................ 18, 22, 25

*Pickering v. Bd. of Educ.*,
391 U.S. 563 (1968) ............................................................ 46

*Pineda v. Skinner Servs., Inc.*,
22 F.4th 47 (1st Cir. 2021) ............................................................ 14

*Prof'l Real Est. Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993) ............................................................ 43

*Reaves v. City of Corpus Christi*,
518 S.W.3d 594 (Tex. App. 2017) ............................................................ 30

*Renegotiation Bd. v. Bannercraft Clothing Co.*,
415 U.S. 1 (1974) ............................................................ 47

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
397 F.3d 56 (1st Cir. 2005) ............................................................ 14, 16

*Riverside Nat'l. Bank v. Lewis*,
603 S.W.2d 169 (Tex. 1980) ............................................................ 23

*Rosario-Urdaz v. Rivera-Hernandez*,
350 F.3d 219 (1st Cir. 2003) ............................................................ 33, 44, 47

*Scottsdale Cap. Advisors Corp. v. The Deal, LLC*,
887 F.3d 17 (1st Cir. 2018) ............................................................ 34

*Sheehan v. Starbucks Corp.*,
No. 25-189, 2026 WL 746725 (2d Cir. Mar. 17, 2026) ............................................................ 29

*Sirva Relocation, LLC v. Richie*,
794 F.3d 185 (1st Cir. 2015) ............................................................ 16, 17, 27, 28

*Spradling v. Williams*,
566 S.W.2d 561 (Tex. 1978) ............................................................ 24

*Sprint Commcn's, Inc. v. Jacobs*,
571 U.S. 69 (2013) ............................................................ 17

*Stroman Realty, Inc. v. Wercinski*,
513 F.3d 476 (5th Cir. 2008) .................................................. 39

*Tamm v. Nerad*,
No. 24-1155, 2025 WL 2674302 (6th Cir. Sept. 18, 2025)................................ 43

*Tejidos de Coamo, Inc. v. Int'l Ladies' Garment Workers' Union*,
22 F.3d 8 (1st Cir. 1994)................................................. 47

*Tex. v. Colony Ridge, Inc.*,
No. CV H-24-0941, 2024 WL 4553111 (S.D. Tex. Oct. 11, 2024)..................... 23

*Together Emps. v. Mass Gen. Brigham Inc.*,
32 F.4th 82 (1st Cir. 2022)................................................15

*Tony Alamo Christian Ministries v. Selig*,
664 F.3d 1245 (8th Cir. 2012) ..............................................19

*Uffner v. La Reunion Francaise, S.A.*,
244 F.3d 38 (1st Cir. 2001)................................................. 14

*United Books, Inc. v. Conte*,
739 F.2d 30 (1st Cir. 1984) ............................................ 18, 19

*United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*,
960 F.2d 1080 (1st Cir. 1992)...............................................15

*United States v. Armstrong*,
517 U.S. 456 (1996) ..................................................... 33

*United States v. Swiss Am. Bank, Ltd.*,
274 F.3d 610 (1st Cir. 2001) ............................................... 35

*Walden v. Fiore*,
571 U.S. 277 (2014) ..................................................... 37

*Wallace v. Herron*,
778 F.2d 391 (7th Cir. 1985) ............................................... 34

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........................................................15

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980) ..................................................... 39

*Yelp Inc. v. Paxton*,
137 F.4th 944 (9th Cir. 2025)........................................... *passim*

*Yelp Inc. v. Paxton*,
2023 WL 9326179 (N.D. Cal. Oct. 30, 2023) .......... 30

*Younger v. Harris*,
401 U.S. 37 (1971) .......... *passim*

**Constitutional Provisions, Statutes and Rules:**

U.S. Const. amend.
I .......... *passim*
XIV .......... 46

28 U.S.C.
§ 1292(a)(1) .......... 3
§ 1331 .......... 3
§ 1391(b) .......... 40
§ 1391(b)(1) .......... 40
§ 1391(b)(2) .......... 41
§ 1391(b)(3) .......... 40
§ 1406(a) .......... 40

42 U.S.C. § 1983 .......... 42, 43

Tex. Const. art. IV, § 22 .......... 48

Mass. Gen. Laws Ann. ch. 93A, § 2 .......... 25

Tex. Bus. & Com. Code
§ 17.45(1) .......... 24, 26
§ 17.45(2) .......... 24, 26
§ 17.45(3) .......... 24
§ 17.45(6) .......... 24, 26
§ 17.45(8) .......... 7
§ 17.46 .......... 1, 26
§ 17.46(a) .......... 23, 25
§ 17.46(b) .......... 23
§ 17.47(c) .......... 23

Fed. R. Civ. P.
11 .......... 29
41(a)(2) .......... 21

**Other Authorities:**

17B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* (3d ed. 2026) .......... 19

Erwin Chemerinsky, *Federal Jurisdiction* (4th ed. 2004) ........ 19

Orders, *Am. Acad. of Pediatrics*, No. 26-2238 (7th Cir. 2026),
Dkt. 34 ........ 21
Dkt. 43 ........ 21

## Reasons Why Oral Argument Should Be Heard

This appeal concerns a preliminary injunction issued by a Massachusetts district court barring the Texas Attorney General from enforcing Texas consumer-protection law in a Texas court. Because *Younger* abstention squarely forecloses this interference with state-court proceedings and there is no personal jurisdiction, this Court could reverse without oral argument. But given the significance of the issues at stake, oral argument is warranted.

# Introduction

ActBlue violated Texas's Deceptive Trade Practices Act (DTPA) by misrepresenting its services. Tex. Bus. & Com. Code § 17.46. The district court found that ActBlue represented to Congress that it "no longer accept[s] gift card donations." App.663. But as the order below demonstrates, that representation was false. ActBlue accepts gift card donations. App.668 n.6 (finding that ActBlue accepts gift card donations "sourced through a major credit card provider").

The district court misunderstood the claims at issue, suggesting that by asserting DTPA claims against ActBlue in state court, Texas was attempting to enforce federal election law. That was wrong: Texas forbids all businesses, including those providing election-related services, to misrepresent the services they provide. In the state-court proceedings, the Consumer Protection Division is not required (and does not intend) to prove that ActBlue accepted fraudulent donations or violated federal law. The basis for liability is ActBlue's misrepresentation of its services, an allegation that is not only plausible and raised in good faith but appears to be uncontested. App.668 n.6. If ActBlue has any federal or state defenses, it can raise them in state court.

Despite making findings that support liability, the district court enjoined the Texas Attorney General from fulfilling his duty to enforce Texas law, based on erroneous findings that the Attorney General acted in subjective bad-faith. The purpose of *Younger* abstention is to bar this sort of federal interference with state-court proceedings, and it squarely forecloses the preliminary injunction here. The same is true of the district court's lack of personal jurisdiction over the Texas Attorney General and the lack of venue in Massachusetts.

The *en banc* Seventh Circuit recently granted a stay pending appeal of a similar order. This Court should reverse and direct the district court to dismiss the case.

## Jurisdictional Statement

The district court had federal question jurisdiction under 28 U.S.C. § 1331. The district court entered the preliminary injunction on June 11, 2026, App.661, and Defendant timely filed a notice of appeal on June 15. App.676. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## Statement of the Issues

1. Whether *Younger* abstention bars the suit.
2. Whether the district court had personal jurisdiction over the Texas Attorney General.
3. Whether venue is proper in Massachusetts.
4. Whether the district court erred in entering the preliminary injunction.

## Statement of the Case

ActBlue LLC is a Massachusetts corporation that conducts business in Texas as a registered foreign corporation. App.255–56. ActBlue provides a fundraising platform that processes donations to Democratic campaigns. App.257.[1] ActBlue promises to provide various services to donors and campaigns, including screening and processing donations. App.271–76. In exchange, ActBlue charges processing fees from each donation made through its platform. App.257.

Federal election law imposes strict limits on campaign donations. Campaigns that accept donations in violation of these laws can face significant liability, and campaigns rely on representations made by ActBlue regarding its screening and verification of donations. App.271–76.

***ActBlue Represents That It Will Not Accept Donations from Gift Cards.***

One area of ongoing concern has been donations made through prepaid gift cards. ActBlue has long known and understood the problems associated with such donations. As far back as 2013, ActBlue told the Federal Election Commission that "[p]repaid debit cards and gift cards do pose a unique threat of evasion of the contribution limits by a particular motivated actor" and "could be utilized to make prohibited straw donor contributions." App.259. In October 2023, spurred by

[1] This brief uses the term "ActBlue" to collectively refer to Plaintiffs: (1) ActBlue LLC, "a non-profit PAC" headquartered in Boston, Massachusetts, App.322; (2) ActBlue Civics, Inc., "a Massachusetts non-profit organization", App.322; (3) ActBlue Charities, Inc., "a Massachusetts nonprofit organization", App.322; and (4) ATS, Inc., "a Massachusetts non-profit corporation that previously provided technical services supporting ActBlue's fundraising platform[.]" App.322–23.

concerns raised by then-Senator Marco Rubio regarding ActBlue's activities a few months prior, House Administration Committee Chairman Bryan Steil sent ActBlue a demand letter outlining concerns that prepaid cards were being used to "wash" unlawful donations through ActBlue's platform. App.259.

In December 2023, the Texas Attorney General opened an investigation into whether ActBlue's platform was enabling donor fraud in violation of Texas election laws. App.262. The Consumer Protection Division mailed Requests to Examine (RTEs) to ActBlue's Texas registered agent and Massachusetts offices. App.328–55. These RTEs sought documents sufficient to show Plaintiffs' policies for verifying the identity of persons who make political contributions through ActBlue's websites. *See* App.328–55. Six months later, the Consumer Protection Division issued Civil Investigative Demands (CIDs) by email to ActBlue's Texas-based counsel, seeking documents related to gift card-verification policies. App.359–72. ActBlue produced documents in response to the RTEs and CIDs. App.377–78. There is no evidence that the Attorney General or any member of his office travelled to Massachusetts in connection with the investigation.

Congress's investigation continued in the meantime, culminating in an October 2024 subpoena concerning donor verification, which expressed concerns that ActBlue's "failure to verify donor identities may have allowed foreign actors to fraudulently participate in the political process." App.263. As the district court found, "ActBlue subsequently informed Congress that it had updated its policies and no longer accepted gift card donations." App.663. An April 2, 2025, joint congressional report confirmed that ActBlue stopped accepting gift card donations.

App.263–64. ActBlue assured donors and campaigns that it adopted "measures . . . [that] help to ensure the identity of donors, root out potential foreign contributions, and protect donors from financial fraud." App.260–62.

***ActBlue Accepts Gift Card Donations, Contrary to Its Representation.***

In early 2026, the Consumer Protection Division sought to verify the truthfulness of ActBlue's representations regarding the antifraud protections it affords to its donation practices.[2] It did so by attempting to make donations through ActBlue's platform using physical and e-gift cards. App.267–68. If ActBlue had truthfully represented that it "no longer accepted gift card donations," App.663, these donations would have been rejected. App.260–62. But as the district court found (and ActBlue now concedes), at least three of these attempts were "successful." App.668.

On February 19, 2026, an investigator donated through ActBlue using a physical Mastercard gift card purchased at a retail outlet under a pseudonym. App.268, 547–51 (receipt). On February 25, 2026, a second investigator donated through ActBlue using a Visa e-gift card purchased online. App.268, 542–44 (receipt). The same investigator donated ten dollars using the same Visa e-gift card later that day. App.268, 546 (receipt). All three donations were made in Texas and were accepted by ActBlue. App.268, 542–51.

ActBlue now admits that, contrary to its representation to Congress, its donors, and the campaigns to which it provides services, it accepts gift card donations.

[2] "'Consumer [P]rotection [D]ivision' means the consumer protection division of the attorney general's office." Tex. Bus. & Com. Code § 17.45(8).

According to ActBlue, it only refuses to accept gift card donations that "its processing vendor . . . identif[ies] . . . as gift cards." App.668 n.6. Its processing vendor, in turn, apparently does not identify gift cards that are "sourced through a major credit card provider." App.668 n.6. ActBlue thus concedes that the representation about its services—that it does not accept gift cards—is incorrect.

***The New York Times Reports That ActBlue Made Misrepresentations to Congress.***

In addition, according to a New York Times exposé published on April 2, 2026, ActBlue's outside counsel—Covington & Burling—wrote two memoranda to ActBlue in early 2025 concluding that "ActBlue's chief executive had given a potentially misleading response to congressional Republican investigators in a 2023 letter explaining how the organization vetted donations to ensure that they were not illegally coming from foreign citizens." App.242. Covington concluded that (1) ActBlue failed to consistently follow its security procedures, App.243–44, (2) there was "substantial risk that some of the funds received were impermissible contributions from foreign nationals," App.246, and (3) ActBlue's conduct may result in criminal investigation. App.242. Top officials at ActBlue resigned soon thereafter. App.243.

***The Consumer Protection Division Sues ActBlue Because of Its Violation of Texas Consumer Protection Laws***

Following the publication of the New York Times story confirming the findings from its investigation that ActBlue misrepresented its donation practices, the Consumer Protection Division initiated a Texas state-court enforcement action on April 20, 2026. App.253–80. The petition—the pleading initiating an action in Texas

state court—alleges that ActBlue violated Texas's DTPA by misrepresenting its processes for reviewing donations and screening out impermissible donations. App.271–76.

The Consumer Protection Division did not seek a temporary restraining order, although Texas law permitted it to do so, and no hearing on a temporary injunction—the state law equivalent of a preliminary injunction—was set.

***ActBlue Sues the Texas Attorney General in Massachusetts.***

On May 1, 2026, ActBlue filed the underlying suit and an expedited motion for preliminary injunction in Massachusetts federal court. App.005, 050. The complaint alleges that the Texas DTPA suit against ActBlue was filed in retaliation for ActBlue's "facilitating contributions for, and distributing funds to, Democratic and liberal candidates in Texas and nationwide," particularly for funds raised for candidate James Talarico. App.040, 665.

The complaint seeks (1) declarations that the Attorney General's DTPA suit violates ActBlue's rights, (2) fees and costs, (3) temporary, preliminary, and permanent injunctions against the Attorney General and his Office preventing any further investigation of ActBlue, and (4) an order requiring that the Texas state-court action be dismissed with prejudice. App.043–44.

The Attorney General responded to the expedited motion for preliminary injunction and moved to dismiss the Massachusetts federal court action on *Younger*

abstention, personal jurisdiction, and venue grounds. App.379–403, 552–77. The district court held a hearing on these motions on June 4. App.678–741.[3]

The district court denied the Attorney General's motion to dismiss, finding in a single paragraph that personal jurisdiction existed and venue was proper. App.665–66.

Despite acknowledging that *Younger* abstention would ordinarily bar a federal court from enjoining ongoing state proceedings, the district court concluded that this case fit within *Younger*'s narrow bad-faith exception, which this Court has never applied. Without citation to state law or any state-court decisions regarding the Texas DTPA, the district court speculated about the validity of "the theory of harm underlying the consumer fraud claims," suggesting that it was "not a compelling basis on which to premise a major lawsuit." App.668.

The district court refused to consider the New York Times article as a basis for the lawsuit on the ground that the Office of the Attorney General "never fact-checked the reporting against the underlying documents." App.664–65 n.3. The district court did not cite any state or federal pleading standard requiring articles to be "fact-checked" before they could serve as the basis for allegations in a pleading.

[3] In interim, in state court, ActBlue filed a verified special appearance challenging the Texas court's jurisdiction and its original answer on May 18. App.406, 409–46. The Consumer Protection Division filed an amended petition on May 20. App.406, 450–89. Two days after that, ActBlue noticed a hearing on its verified special appearance on June 25. App.407, 494. The parties entered an agreement on May 26 regarding the timing and scope of expedited discovery relating to ActBlue's special appearance, App.407, 498–99, and served expedited discovery the same day. App.407, 503–41.

Despite finding that Attorney General Paxton (and Congress) had investigated ActBlue's practices for years and despite its findings demonstrating that ActBlue made misrepresentations regarding its services, the district court speculated that the true reason for the lawsuit was an FEC fundraising report filed by Talarico. App.665. Based on that timing and misinterpretation of Attorney General Paxton's public statements, the district court made findings about his "true motivation." App.670.

The district court did not address whether the state lawsuit was meritorious as a matter of state law. Nonetheless, the district court applied *Younger*'s bad-faith exception.

In addressing the likelihood of success prong for a preliminary injunction, the district court refused to apply the well-established framework of *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), looking only at the portion of that opinion concerning public employee speech. *See* App.674 n.8 (erroneously describing *Mt. Healthy* as concerning "the (limited) right of a government employer to prohibit speech by its employees").

It then resolved the remaining preliminary injunction factors in ActBlue's favor before "enjoin[ing] and restrain[ing]" the Attorney General and his office "from continuing to litigate the Texas state civil enforcement action . . . or from bringing any new state civil enforcement action premised on the same conduct." App.675.

Attorney General Paxton timely noticed this appeal. App.676.

## Summary of the Argument

The district court entered an extraordinary preliminary injunction blocking the Texas Attorney General from enforcing Texas's consumer-protection laws in a Texas court against Texas-registered foreign corporations for violations committed in Texas. That injunction rests on a fundamental misunderstanding of the state claims. The Attorney General is not trying to enforce federal campaign-finance rules. The Consumer Protection Division is instead bringing a straightforward DTPA claim based on ActBlue's misrepresentations regarding its services—particularly its public statement that it "no longer accepted gift card donations," which (as the district court found) was disproved when investigators successfully made gift-card contributions that the platform processed. App.668 n.6 (finding that ActBlue accepts gift card donations "sourced through a major credit card provider").

This injunction cannot be squared with *Younger v. Harris*, 401 U.S. 37 (1971). *Younger* requires federal courts to abstain from interfering with ongoing state-court proceedings, and its narrow "bad-faith" exception does not apply here. That exception is reserved for repeated, baseless prosecutions brought "without hope" of success. But this case involves a single enforcement action supported by years of congressional inquiry, concrete investigative transactions, and the district court's own findings confirming ActBlue's misrepresentation. The *en banc* Seventh Circuit recently stayed an analogous injunction in *American Academy of Pediatrics v. Uthmeier*, No. 26-2238 (7th Cir. 2026), recognizing that federal interference with a facially non-frivolous state enforcement action contravenes core federalism principles. The same course is warranted here.

The injunction also fails for independent jurisdictional reasons. The district court asserted personal jurisdiction over the Texas Attorney General based largely on investigative correspondence sent to ActBlue's Massachusetts offices nearly three years before this suit—contacts incidental to a Texas investigation and unrelated to ActBlue's retaliation claims. The district court further relied on a clearly erroneous factual finding that the Attorney General "conducted his review" of documents at ActBlue's Massachusetts headquarters, even though no party even alleged that this travel to or inspection in Massachusetts occurred. Venue in Massachusetts is likewise improper because the alleged retaliation occurred entirely in the form of the filing of a lawsuit in Texas.

Finally, ActBlue cannot satisfy any of the preliminary injunction factors. When a State brings a civil enforcement action, First Amendment retaliation standards should require at least an objective showing akin to lack of probable cause. *Nieves v. Bartlett*, 587 U.S. 391, 403 (2019). The Attorney General had more than enough basis to sue under the DTPA given ActBlue's own statements and the successful test donations. The district court also misapplied *Mt. Healthy*, 429 U.S. 274, by disregarding the Attorney General's defense that he would have filed the same suit regardless of any protected speech. Enjoining the Texas action inflicts a direct, ongoing burden on Texas's sovereign interest in enforcing its laws, while ActBlue remains free to raise all constitutional defenses in Texas court. This Court should reverse the order granting the preliminary injunction and direct the district court to dismiss the case.

## Standard of Review

Although the decision whether to enter a preliminary injunction is reviewed for abuse of discretion, "[w]ithin that framework . . . findings of fact are reviewed for clear error and issues of law are reviewed *de novo*." *Pineda v. Skinner Servs., Inc.*, 22 F.4th 47, 53 (1st Cir. 2021) (quoting *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 41 (1st Cir. 2010)). Likewise, "*Younger* abstention is mandatory if its conditions are met, and [this Court's] review of whether th[ose standards] have been met is *de novo*." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 68 (1st Cir. 2005) (citing *Esso Standard Oil Co. v. Cotto*, 389 F.3d 212, 217 (1st Cir. 2004)).

This Court reviews decisions concerning whether to dismiss for lack of personal jurisdiction *de novo*. *Knox v. MetalForming, Inc.*, 914 F.3d 685, 690 (1st Cir. 2019). It also applies *de novo* review to decisions concerning whether venue is proper. *Uffner v. La Reunion Francaise*, *S.A.*, 244 F.3d 38, 40, 41–43 (1st Cir. 2001).

## Argument

A preliminary injunction is "an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and it "should not be granted unless the movant, by a clear showing, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (cleaned up). Establishing personal jurisdiction is a prerequisite to entry of a preliminary injunction. *See United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1099 (1st Cir. 1992) ("Because the plaintiffs failed to establish that the court below was entitled to exercise *in personam* jurisdiction over [defendant], . . . the case must be remanded . . . with directions to vacate the preliminary injunction[.]").

To enter a preliminary injunction, the district court must "weigh[] four factors: (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest." *Jean v. Mass. State Police*, 492 F.3d 24, 26–27 (1st Cir. 2007). "The first two factors are the most important." *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). Failure to establish either is independently fatal. *Id.* at 85–87 (denying the injunction because plaintiffs failed to show irreparable harm without considering the other factors). The last two factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

## I. *Younger v. Harris* Required the District Court To Abstain.

This injunction represents precisely what the Supreme Court foreclosed in *Younger*, 401 U.S. at 44. Federal courts do not preside over state courts, and an injunction issued by the former to the latter intrudes on state sovereignty. *Id*. at 43. Abstention doctrines arise out of respect for "familiar principles of federalism and comity," which "soften the tensions inherent in a system that contemplates parallel judicial processes" in state and federal courts. *Cruz v. Melecio*, 204 F.3d 14, 23 (1st Cir. 2000). *Younger* reiterated what the Supreme Court had held "time and time again": "[T]he normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." 401 U.S. at 45; *see Daves v. Dallas County*, 64 F.4th 616, 624 (5th Cir. 2023) (en banc) (explaining that *Younger* reflects a "'longstanding public policy against federal interference with state court proceedings'" (quoting *Younger*, 401 U.S. at 43-44)). Put another way, a party "cannot scurry to federal court and plead [a federal] defense as a basis for enjoining the state proceeding." *Nader v. Keith*, 385 F.3d 729, 732 (7th Cir. 2004) (collecting authorities).

"*Younger* abstention is mandatory if its conditions are met," *Rio Grande*, 397 F.3d at 68, "even where defendants claim violations of important federal rights," *In re Justs. of Super. Ct. Dep't of Mass. Trial Ct.*, 218 F.3d 11, 17 (1st Cir. 2000) (collecting authorities). This Court has distilled a "three-step approach to *Younger* abstention." *Sirva Relocation, LLC v. Richie*, 794 F.3d 185, 192 (1st Cir. 2015). The first step is for the court to "ascertain whether a particular state proceeding falls within the *Younger* taxonomy," and the second is to consider

"whether the *Middlesex* [*County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 (1982)] factors support abstention." *Id.* at 193. The final step is to determine whether any "exceptions to the *Younger* doctrine apply." *Id.*

There is no dispute in this case that the first two steps of the *Younger* inquiry have been met. As for the first step, "three types of state proceedings trigger *Younger* abstention: (i) criminal prosecutions, (ii) 'civil proceedings that are akin to criminal prosecutions,' and (iii) proceedings 'that implicate a State's interest in enforcing the orders and judgments of its courts.'" *Id.* at 192 (quoting *Sprint Commcn's, Inc. v. Jacobs*, 571 U.S. 69, 72–73 (2013)). Texas's DTPA enforcement action is the type of civil enforcement action to which *Younger* applies. *Cf. id.* at 193–95.

As for the second step, each of the *Middlesex* factors supports abstention. Those factors are: (1) "whether there is an ongoing state proceeding that is judicial in nature"; (2) "whether the proceeding implicates important state interests"; and (3) whether there is an adequate "opportunity to raise federal defenses in the state proceeding." *Id.* at 196. Each factor is met here: there is a pending DTPA enforcement action in a Texas state court, and that case implicates important questions about the veracity of ActBlue's representations to Texans. Nor is there any serious question that Texas's state courts remain open for ActBlue to assert its First Amendment retaliation claim.

This case therefore hinges on the third step of this Court's *Younger* framework. ActBlue and the district court's order rely on only the "bad-faith exception" to *Younger* to conclude that abstention is unwarranted. App.666–71. Under that exception, federal courts may enjoin state enforcement actions brought "in bad faith

*without hope* of obtaining a valid conviction." *Perez v. Ledesma*, 401 U.S. 82, 85 (1971) (emphasis added). The bad-faith exception is "very narrowly construed," *United Books, Inc. v. Conte*, 739 F.2d 30, 34 (1st Cir. 1984), and the "assertion that the state's prosecution has had a 'chilling effect' on First Amendment rights is insufficient," *id.* at 33. Indeed, in the 55 years since *Younger* was decided, the bad-faith exception has never been applied by the Supreme Court or this Circuit.

The district court's application of the bad-faith exception fails for four independent reasons: (1) there were no repeated prosecutions; (2) the state suit is meritorious (and, at minimum, not "without hope" of success); (3) there is no *Younger* irreparable injury; and (4) the district court's findings about subjective bad-faith are incorrect and irrelevant.

### A. *Younger*'s bad-faith exception applies only to repeated failed proceedings.

*Younger*'s narrow bad-faith exception applies only to repeated, unsuccessful state-court proceedings. The Supreme Court has applied this exception just once, before *Younger*, in *Dombrowski v. Pfister*, 380 U.S. 479 (1965). There, a state judge "quashed . . . arrest warrants as not based on probable cause." *Id.* at 487–88. Despite the state court's orders, the prosecutor "continu[ed] to threaten to initiate new prosecutions of appellants under the same statutes." *Younger*, 401 U.S. at 48. Under these "unusual circumstances," defending the criminal prosecution in state court would "not assure adequate vindication of constitutional rights." *Id.* at 48–49 (citation omitted).

*Younger* explained that "the cost, anxiety, and inconvenience of having to defend against a single . . . prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term." *Id.* at 46. "[T]he threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single . . . prosecution." *Id.*

Courts and legal commentators thus concluded that the bad-faith exception applies "to only one specific set of facts: where state officials initiate *repeated* prosecutions to harass an individual or deter his conduct, and where the officials have *no* intention of following through on these prosecutions." *Ken-N.K., Inc. v. Vernon Twp.*, 18 F. App'x 319, 324 n.2 (6th Cir. 2001) (emphasis added); *see also* Erwin Chemerinsky, *Federal Jurisdiction* § 13.4 (4th ed. 2004). "Indeed, the bad-faith exception is so narrow that '[t]here is no case since *Younger* was decided in which the [Supreme] Court has' applied it." *Am. Acad. of Pediatrics v. Uthmeier*, 178 F.4th 1113, 1130 (7th Cir. 2026) (Scudder, J., dissenting) (quoting 17B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4255 (3d ed. 2026)), *op. vacated, reh'g en banc granted* 180 F.4th 1022 (7th Cir. 2026); *see also Gates v. Strain*, 885 F.3d 874, 881 (5th Cir. 2018) ("The 'bad faith' exception is narrow and should be granted parsimoniously." (internal quotation marks omitted)).

This Circuit, like its sister circuits, has guarded against attempts to extend the bad-faith exception beyond the circumstances of *Dombrowski*. *See, e.g.*, *United Books*, 739 F.2d at 34 ("On the facts of this case—six prosecutions over a two-year period that resulted in convictions all but once—we cannot say that the *Younger* exceptions have been satisfied.") (citing *Grandco Corp. v. Rochford*, 536 F.2d 197, 204 (7th Cir.

1976)); *cf. Tony Alamo Christian Ministries v. Selig*, 664 F.3d 1245, 1254 (8th Cir. 2012) ("While the Supreme Court has not ruled out use of the bad faith exception in civil cases, it has never directly applied the exception in such a case and we have only recognized it in the criminal context.").

This appeal concerns only a single enforcement action in state court. As the district court found, ActBlue falsely represented to Congress and the public that it "updated its policies and no longer accepted gift card donations." App.663; *see also* App.668 n.6. That suit is the only suit that has been filed by the Attorney General against ActBlue for these acts, and ActBlue has not suffered any alleged threat to its "federally protected rights . . . that cannot be eliminated by [it]s defense against a single . . . prosecution." *Younger*, 401 U.S. at 46.

None of the cases cited in the district court's order supports its decision not to abstain under *Younger*. *Netflix, Inc. v. Babin*, for example, concerned "*four* new indictments" that followed a year after the original. 88 F.4th 1080, 1092 (5th Cir. 2023). And unlike *Netflix*, where the defendant was charged and "the case sat idle for a year" before the new indictments were added, *id.*, the state case here was filed on April 20, 2026 and was being actively litigated. It is stayed now only because of the preliminary injunction.

*Jolt Initiative, Inc. v. Paxton* found that *Younger* did not apply at all because the state-court proceeding "did not precede Plaintiff's litigation in federal court." 821 F. Supp. 3d 706, 716 (W.D. Tex. 2026); *see also id.* at 718 ("The Court is therefore persuaded . . . that 'proceedings of substance' have occurred here such that the Court may not abstain under *Younger*."). *Younger*'s bad-faith exception was

an alternative holding to the court's conclusion that *Younger* did not apply. Moreover, the district court applied that exception only because it found that there were a "multiplicity of prosecutions" for which there was "no hope" of obtaining a favorable outcome. *Id.* at 719. Here, by contrast, there is only one state enforcement action, which preceded ActBlue's filing of the underlying federal suit, and as detailed below, ample evidence supports the state action's probability of success. *Infra* § I(B); *see also supra* 5–8 (outlining years of congressional, state, and New York Times investigations into ActBlue's conduct). Indeed, the district court's finding that ActBlue concedes that three gift card donations were successful confirms that ActBlue made misrepresentations regarding its services. App.668.

*Media Matters for America v. Paxton*, 732 F. Supp. 3d 1 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025), is even further afield because that case did not address *Younger* abstention. Nor is it relevant that the plaintiff in *Media Matters* also brought a First Amendment retaliation claim: the existence of other suits alleging retaliation has no bearing on whether the underlying state DTPA enforcement action here is "without hope" of success under Texas law—a key question in determining the bad-faith exception's applicability to this case. *Infra* § I(B).

Finally, the district court cites *American Academy of Pediatrics v. Uthmeier*, 2026 WL 1552734 (N.D. Ill. June 2, 2026), as supporting its analysis of the bad-faith exception, because the district court there enjoined a state-court proceeding in a strikingly similar case. App.670. Yet the *en banc* Seventh Circuit stayed that injunction pending appeal, and the plaintiff is now seeking to dismiss its case under Federal Rule of Civil Procedure 41(a)(2). *See* Order, *Am. Acad. of Pediatrics v.*

*Uthmeier*, No. 26-2238 (7th Cir. Jul. 8, 2026), Dkt. 34.; Order, *Am. Acad. of Pediatrics*, No. 26-2238 (7th Cir. July 29, 2026), Dkt. 43. This case does not support application of the narrow bad-faith exception here.

The district court's reasoning would open wide *Younger*'s "very narrow gate for federal intervention," *Arkebauer v. Kiley*, 985 F.2d 1351, 1358 (7th Cir. 1993), by allowing state-court defendants to run to federal courts to enjoin any state-court enforcement action as soon as it is filed, as ActBlue did here. But here there are no multiple prosecutions, and the Attorney General "intend[s to] follow[] through on [his] prosecution" of ActBlue's DTPA violations, so *Younger*'s bad-faith exception is inapplicable. *Ken-N.K.*, 18 F. App'x at 324 n.2.

### B. *Younger*'s bad-faith exception requires that the state-court proceeding be "without hope" of success.

*Younger*'s bad-faith exception is inapplicable for a second reason: that exception requires that the state-court proceeding be brought "*without hope* of obtaining a valid conviction." *Perez*, 401 U.S. at 85 (emphasis added). As *Yelp Inc. v. Paxton* illustrates, that standard is exceedingly difficult to satisfy. 137 F.4th 944 (9th Cir. 2025). ActBlue has not done so here. To the extent the district court addressed this requirement at all, its conclusion was legally erroneous.

**1.** In *Yelp*, a similar case, the Ninth Circuit rejected Yelp's attempts to apply *Younger*'s bad-faith exception because Yelp could not demonstrate that the state-court action was "based on a 'clearly inapplicable' law, for which 'there was *never any remote chance*' that it could be enforced against the state court defendant." *Id.* at 952 (quoting *Netflix*, 88 F.4th at 1095) (emphasis added). As the court explained,

"[i]t is one thing to say that [the] Texas lawsuit should fail, or even that it should fail as a matter of law[, but i]t is quite another to put federal courts in the vocation of making these determinations on behalf of state courts, while taking the significant step of enjoining state court proceedings." *Id.* "Exacting federal court review of the merits of a state court lawsuit, followed by an injunction whenever we conclude the state court suit is meritless, would invite the very interference with state court proceedings that *Younger* seeks to prevent." *Id.*

ActBlue cannot meet these standards because the DTPA claims against it are based on applicable law and have a more than substantial chance of success.

The DTPA authorizes the Consumer Protection Division to bring actions against persons who have engaged in any act or practice deemed unlawful under the DTPA. *See* Tex. Bus. & Com. Code § 17.46(a) ("False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and subject to action by the consumer protection division[.]"), (b) (describing "unlawful" acts and practices under the statute); *Tex. v. Colony Ridge, Inc.*, No. CV H-24-0941, 2024 WL 4553111, at *8 (S.D. Tex. Oct. 11, 2024) ("Anyone engaging in 'deceptive practices may be subjected to a suit by the Consumer Protection Division of the Attorney General's Office, under [DTPA] section 17.47.'") (quoting *Riverside Nat'l. Bank v. Lewis*, 603 S.W.2d 169, 173 (Tex. 1980)).[4] ActBlue qualifies

[4] Texas law does not require the Attorney General to allege any injuries to particular consumers to bring DTPA claims, *see, e.g.*, *Holzman v. State*, No. 13-11-00168-CV, 2013 WL 398935, at *3 (Tex. App. 2013) ("Moreover, it is not necessary for the State to allege any injury to a [consumer] to recover the civil penalties it seeks in its live petition.") (citing Tex. Bus. & Com. Code § 17.47(c)).

as a "person" under the DTPA's definitions, Tex. Bus. & Com. Code § 17.45(3), and its fundraising platform—the technology through which it raises and distributes funds—constitutes "goods" or "services" and is the conduit of ActBlue's "trade or commerce" under the DTPA, *id.* § 17.45(1), (2), (6); App.271 n.57.

An act is false, misleading, or deceptive under the DTPA "if it has the capacity to deceive an 'ignorant, unthinking, or credulous person.'" *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 479–80 (Tex. 1995) (quoting *Spradling v. Williams*, 566 S.W.2d 561, 562 (Tex. 1978)).

ActBlue represented to Congress and the public that it "updated its policies and no longer accepted gift card donations." App.663. In its DTPA suit, the Consumer Protection Division plausibly alleges that this representation was false: "ActBlue failed to provide the service to campaigns that it promised." App.272. Not only was this allegation plausible, but its correctness appears to be conceded. As the district court found, ActBlue did not deliver the services it promised and, contrary to its representations, accepts gift card donations "sourced through a major credit card provider." App.668 n.6. This misconduct—making public promises about a service and failing to provide it—falls within the heartland of consumer-protection laws. At a minimum, in the light of the district court's findings confirming ActBlue's misrepresentations, the state-court case was not "without hope" of success or based on a "clearly inapplicable law."

**2.** The district court did not directly address this requirement of *Younger*'s bad-faith exception, much less properly apply the governing legal standard. To the extent it did, the court's analysis can be found in its statements that the Attorney

General's "theory of harm underlying the consumer fraud claims rings hollow" and that ActBlue's misrepresentations were "not a compelling basis on which to premise a major lawsuit." App.668. The court did not cite any case—much less a Texas state decision—in support of these assertions, and as described above, any suggestion that the DTPA claims are "without hope" of success, *Perez*, 401 U.S. at 85, or based on a "clearly inapplicable law," *Yelp*, 137 F.4th at 952, is incorrect. *See supra* 5–8, 22–24. Far from supporting the preliminary injunction, these findings only demonstrate the district court's error under *Younger*.

The district court may, as policy matter, disagree with the Texas Legislature's determination that businesses should not engage in misrepresentations regarding their goods or services. *See* App.668 (criticizing the principle that "businesses [must] stay true to their word" as a basis for liability). But this policy decision is left to the State of Texas, which has declared unlawful all "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce" and made them "subject to action by the consumer protection division." Tex. Bus. & Com. Code § 17.46(a). Many States, including Massachusetts, have done the same. Mass. Gen. Laws ch. 93A, § 2. Federal courts should not second-guess the policy judgments behind state law, and as a matter of Texas law, ActBlue's misrepresentations to Texas consumers about its services violated the DTPA.

The district court's further suggestion that ActBlue's misrepresentation "appears more relevant to the question of whether ActBlue violated campaign finance laws (an issue which is not and cannot be raised in the state-court proceeding) than whether it defrauded consumers" is irrelevant. App.668 n.6.

Whether accepting gift card donations violated campaign finance laws is not at issue in the Texas proceeding—what matters is that ActBlue misrepresented its services. No authority supports the district court's suggestion that a misrepresentation is not actionable under the DTPA because it might also relate to violations of other laws.

Nor was the district court correct to suggest, without citation to Texas authority, that the "speech at issue" does not fall within the DTPA because it is not "commercial." App.669. The order misidentifies the "speech at issue" as ActBlue's "choice of which candidates or causes it will include on its platform" and "donors' individual choices to fund those candidates or causes with which the donor identifies." App.669. To be clear, that is *not* the speech at issue in the state proceeding.

As shown throughout the state-court petition, the speech at issue is ActBlue's statements that it employed "robust security program[s] and fraud prevention practices" to prevent potentially illegal donations, particularly its representation that it "no longer accept[s] gift card donations." App.663; *see also* App.253–80 (petition). That speech concerns the services ActBlue provides through its fundraising platform, a service for which ActBlue receives compensation. Tex. Bus. & Com. Code § 17.45(1),(2), (6); *id.* § 17.46; App.257, 271 n.57. The fact that ActBlue's services purportedly help campaigns comply with their legal obligations under campaign finance laws only emphasizes the materiality of ActBlue's misrepresentations. App.260. Put simply, ActBlue provides services in exchange for compensation. *See* App.257 (alleging that ActBlue "collect[s] a processing fee of at

least 3.7% for each individual donation"). And the district court's own findings demonstrate that ActBlue misrepresented the services it provides.

This is an ordinary consumer-protection lawsuit, hardly "without hope of success" in Texas state court. The order enjoining it is precisely the sort of "federaliz[ation]" of state law which achieves "the exact result *Younger* abstention is designed to prevent." *Frost v. Nessel*, 712 F. Supp. 3d 1008, 1015 (W.D. Mich. 2024), *aff'd*, No. 24-1132, 2025 WL 1136288 (6th Cir. Apr. 17, 2025).

### C. There is no *Younger* irreparable injury.

Nor did ActBlue establish the irreparable injury necessary to establish *Younger*'s bad-faith exception. "[T]he common thread that links the various *Younger* exceptions is that, in particular situations, closing the door of the federal court to a federal question will result in irreparable harm." *Sirva,* 794 F.3d at 200. This irreparable injury must be one "other than that incidental to every . . . proceeding brought lawfully and in good faith." *Younger*, 401 U.S. at 47. "[O]nly when it is crystal clear that the state tribunal either lacks the authority to proceed or can provide no meaningful relief can a party hope to demonstrate the degree of irreparable harm needed to justify federal-court intervention." *Sirva*, 794 F.3d at 200. ActBlue did not make this showing.

The Texas state court adjudicating the state case is plainly authorized to proceed: the Attorney General sued ActBlue in Texas state court for violations of Texas consumer-protection law committed in Texas, where ActBlue has registered agents and subjected itself to Texas's jurisdiction by conducting business. App.256. And ActBlue has not denied that the state tribunal could provide meaningful relief:

ActBlue is free to seek dismissal or summary judgment in the Texas case and assert any applicable defenses. ActBlue did not "demonstrate the degree of irreparable harm needed to justify federal-court intervention." *Sirva*, 794 F.3d at 200. Although this argument was raised by the Attorney General, App.395, the district court made no findings on this point.

### D. The district court's findings about subjective bad-faith are irrelevant and incorrect.

The district court failed to find the objective requirements for *Younger*'s bad-faith exception to apply. The Texas suit (1) was not a repeated, failed suit; (2) was not "without hope" on the merits; and (3) does not inflict irreparable harm on ActBlue. The district court's subjective bad-faith findings are irrelevant, but even if they were relevant, they are incorrect.

*First*, the district court pointed to the fact that Attorney General Paxton had not sued WinRed—ActBlue's Republican fundraising counterpart—for similar DTPA violations as evidence of bad faith. App.668–69. ActBlue contends that WinRed used "pre-checked recurring donation boxes and layered defaults that led many donors to unknowingly make repeated contributions," which ultimately resulted in "an avalanche of refunds." App.035. But these are fundamentally different allegations than those against ActBlue. ActBlue does not allege that WinRed publicly and falsely represented that it would not accept a particular type of donation. These different liability theories cannot support an inference of bad-faith. *Nieves*, 587 U.S. at 407.

*Second*, the district court dismissed the Attorney General's reliance on the New York Times article—which reported that "ActBlue's chief executive had given a

potentially misleading response to congressional Republican investigators in a 2023 letter explaining how the organization vetted donations to ensure that they were not illegally coming from foreign citizens," App.242—because the Attorney General "never fact-checked the . . . article." App.668 n.7.

The district court did not cite any authority for a fact-checking requirement. As a general matter, Rule 11 permits reliance on newspaper articles. *See, e.g.*, *Sheehan v. Starbucks Corp.*, No. 25-189, 2026 WL 746725, at *3 (2d Cir. Mar. 17, 2026) (unpub.) ("Sheehan also attested that he investigated further and found multiple newspaper articles reporting on those laboratory tests."); *Kelter v. Associated Fin. Grp., Inc.*, 382 F. App'x 632, 634 (9th Cir. 2010) (unpub.) (noting reliance on a newspaper article); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) ("When drafting a complaint, an attorney may rely in part on other sources, such as a newspaper article, as part of his or her investigation into the facts[.]"); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) ("To the extent that a newspaper article corroborates plaintiff's own investigation and provides detailed factual allegations, it can—at least in combination with plaintiff's investigative efforts—be a reasonable source of information and belief allegations.").

In discussing a suit that followed an investigation, the Third Circuit held that "[r]eliance on an article in The Wall Street Journal is not reliance on an insubstantial or meaningless investigation." *Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir. 1982), *abrogated on other grounds by Garber v. Lego*, 11 F.3d 1197, 1206 (3d Cir. 1993). "Plaintiffs and their attorneys need not make further expenditures to prove independently that which may be read with some confidence of truthfulness and

accuracy in a respected financial journal." *Id.* The district court identified no authority requiring "fact-checking" the New York Times article before it could contribute to pleaded allegations.

Moreover, "Texas pleading standards are far more lenient than federal pleading standards." *Bleiweiss v. Panduit Sales Corp.*, No. CIV.A. H-13-0080, 2015 WL 163819, at *3 n.4 (S.D. Tex. Jan. 13, 2015) (detailing differences between Texas and federal pleading standards); *see also*, *e.g.*, *Reaves v. City of Corpus Christi*, 518 S.W.3d 594, 609–12 (Tex. App. 2017) (detailing differences between Texas's lower notice pleading standard and the higher federal plausibility standard). The district court did not consider whether Texas state pleading standards required fact-checking the article.

*Third*, the district court's reliance on the Attorney General's policy statements as evidence of bad faith mirrors the error committed by the district court in *Yelp*, 137 F.4th at 944. There, Yelp attempted to enjoin a state-court proceeding by filing a federal lawsuit in California, arguing that the Attorney General demonstrated bad-faith by "highlight[ing] a 'lengthy public statement' from Yelp's CEO vowing to 'fight[] the legal battle against abortion bans' after *Dobbs*." Yelp. Inc.'s Opposition to Motion to Dismiss Br. at 16, *Yelp Inc. v. Paxton*, 2023 WL 9326179 (N.D. Cal. Oct. 30, 2023). The Ninth Circuit rejected this argument: If Yelp were correct, state enforcement actions would become "retaliatory whenever they touch on hot-button issues." 137 F.4th at 956. Although the action at issue "implicate[d] a sensitive matter on which people disagree," that did not make it "retaliatory within the meaning of *Younger*'s bad-faith exception, especially when the enforcement action

itself is not facially meritless." *Id*. The same is true here. *Supra* 5–8 (outlining years of congressional, state, and New York Times investigations into ActBlue's conduct, demonstrating that the state suit "is not facially meritless.").

Nor did the Attorney General's comments suggest bad faith, "even if [they] used strong rhetoric." 137 F.4th at 956. "[T]reating the commonplace stridency of prosecutorial press releases as synonymous with bad-faith would lead to federal courts enjoining state-court proceedings with great regularity, contrary to the Supreme Court's direction that *Younger*'s exceptions are narrow." *Id*. As the Ninth Circuit explained, "state Attorneys General and other state officials are entitled to have enforcement priorities and policy positions" and to act consistently with them. *Id*. at 955–56. If "an enforcement action consistent with [a] policy direction were enough to establish a retaliatory motive, state courts would regularly be stripped of their authority at the hands of federal injunctions—directly contrary to *Younger*'s overarching message of respect for state courts." *Id*. at 956.

Moreover, the district court misinterpreted the Attorney General's statements as "reveal[ing] his true motivation." App.670. Consider the first statement:

> On a podcast appearance the day he filed the action, for example, [Attorney General] Paxton responded to a question about whether, "as part of this lawsuit," he could "collect information [from ActBlue] that applies to the whole country" with the statement, "I love that question because I am running for U.S. Senate. When in the U.S. Senate, I'll be all over this."

App.670 (alterations, other than the first, in original). Far from showing improper motivation, this statement demonstrates the opposite. When asked about collecting information that "applies to the whole country," rather than discuss the state-court

lawsuit as an attempt to punish or limit ActBlue, Attorney General Paxton discussed what actions he will take "in the U.S. Senate."

Nor does the second statement—culminating in the observation that "it's always been a mystery how [ActBlue] raised this much money," App.671—suggest any improper motive. Attorney General Paxton merely restates the theory of the state suit: ActBlue has improperly raised money by misrepresenting the services it provides.

The fundraising emails sent by Mr. Paxton as a candidate for Senate not only represent core political speech but also restate the theory of this lawsuit: that ActBlue has misrepresented its fundraising practices. He said:

> I've filed a lawsuit against ActBlue for lying about its apparent rampant fundraising fraud, *including* the extremely serious allegation that it has been allowing foreign donors, dark money, and other ineligible donors to funnel money into Democrat campaigns for years via difficult to trace prepaid debit cards and so-called gift cards.

App.628. He also stated:

> ActBlue apparently allowed foreign donors to donate to Democrat campaigns via untraceable prepaid debit cards and credit card gift cards They appeared to have no way of vetting donations to see if they were from foreign donors or not, which appears to directly contradict their testimony to Congress.
>
> This is unacceptable. That's why my office has just filed a lawsuit against ActBlue to hold them accountable to the law for their illegal activity.

App.630.

Crediting the statements quoted above, the Consumer Protection Division "filed a lawsuit against [ActBlue] for lying" because its actual donation vetting

practices "directly contradict [ActBlue's] testimony to Congress." App.628, 630. "That's why," according to Attorney General Paxton, "my office has just filed a lawsuit against ActBlue." App.630.

Even assuming a candidate's political statements could be considered in evaluating a First Amendment retaliation claim, the district court "ma[de] a clear error of judgment in assaying" their meaning and thus abused its discretion. *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 221 (1st Cir. 2003). Certainly nothing in these statements or in the timing of the lawsuit can overcome the strong presumption of regularity to which state enforcement proceedings are entitled. *Cf. United States v. Armstrong*, 517 U.S. 456, 463–64 (1996).

* * *

*Younger* compelled abstention, and the district court's refusal to apply it violates bedrock federalism principles. The Texas Attorney General filed a consumer-protection lawsuit in a Texas state court against corporations registered to do business in Texas for acts committed in Texas. The district court's preliminary injunction against this proceeding is precisely what *Younger* forbids.

## II. The District Court Did Not Have Personal Jurisdiction Over the Texas Attorney General.

Independently, the district court was incorrect to hold that personal jurisdiction exists. App.665–66. Personal jurisdiction required ActBlue to "demonstrate that all three prongs [of specific jurisdiction] are met"—"relatedness, purposeful availment, and reasonableness." *A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 59 (1st Cir. 2016). ActBlue cannot satisfy any of the three.

### A. ActBlue's claim does not arise out of any activities of the Texas Attorney General in Massachusetts.

Courts evaluating relatedness consider "whether the claim directly arise[s] out of, or relate[s] to, the defendant's forum state activities." *Id.* (cleaned up). Where, as here, a plaintiff's claims are grounded in tort, "to assess relatedness [courts] look to whether the plaintiff has established cause in fact (*i.e.*, the injury would not have occurred 'but for' the defendant's forum-state activity) and legal cause (*i.e.*, the defendant's in-state conduct gave birth to the cause of action)." *Scottsdale Cap. Advisors Corp. v. The Deal, LLC*, 887 F.3d 17, 20–21 (1st Cir. 2018) (internal quotation marks omitted*); see also Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 715 (1st Cir. 1996) (declining to adopt a solely "but for" standard and requiring a showing of "proximate or legal cause").

Contacts "incidental to litigation proceeding else-where" do not establish specific personal jurisdiction. *John Crane, Inc. v. Shein L. Ctr., Ltd.*, 891 F.3d 692, 696 (7th Cir. 2018) (citation modified). "[D]irecting pleadings, discovery, and other litigation communications to [a Massachusetts] citizen facing suit in some other state—even in furtherance of a tortious scheme—is simply not the same as targeting that citizen *in* [*Massachusetts*]." *Id.*; *see also, e.g.*, *Wallace v. Herron*, 778 F.2d 391, 394 (7th Cir. 1985) ("[T]he defendants filed . . . motions on behalf of their clients in a California court pursuant to a California lawsuit, and it would be unreasonable to require the defendants to appear in Indiana to defend this suit on the basis of such attenuated contacts.").

The relatedness requirement "focuses on the nexus between defendant's contacts and the plaintiff's cause of action," so courts must ask whether the plaintiff's claims are "directly related to or arose out of" the defendant's forum contacts. *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 621 (1st Cir. 2001).

ActBlue's lawsuit arises from the Consumer Protection Division's filing of a DTPA suit in Texas state court based on ActBlue's misrepresentation about the services it provides in Texas. *See* App.665 ("ActBlue filed suit in this court on May 1, 2026, alleging that Paxton had brought the state action as retaliation against ActBlue for its facilitation of political donations to Democratic candidates (specifically, Talarico)."). These factual allegations have nothing to do with Massachusetts. ActBlue's claims are not directly related to (and do not arise out of) any contacts between Attorney General Paxton and Massachusetts.

The only contact that ActBlue identifies is that the Office of the Attorney General mailed RTEs to ActBlue's Massachusetts headquarters in December 2023, years before the DTPA suit was filed. But ActBlue's May 2026 First Amendment retaliation claims here "directly relate[] to or arose out of" being sued in Texas state court for DTPA violations in April 2026, not receiving RTEs nearly three years earlier. App.662, 664. ActBlue has never even alleged, much less sought to establish, that these RTEs were retaliatory. The investigation that ultimately formed the basis for the underlying claims began in February 2026, when investigators confirmed the falsity of ActBlue's representation (made in connection with the previous investigation) that it "no longer accept[s] gift card donations." App.663.

In addition, the district court's order rests on a clearly erroneous factual finding that Attorney General Paxton "conducted his review of responsive documents at ActBlue's Massachusetts headquarters." App.666. Even if it were relevant, this finding is clearly erroneous. No party has ever alleged—in a pleading, brief, declaration, or at argument—that the Attorney General or anyone from his Office traveled to Massachusetts or conducted any inspection there. *See* App.012–13, 025–26, 052–53; 593–94, 617–18.[5] Not only did the district court err by treating this purported contact with Massachusetts as related to the state-court lawsuit that forms the basis for ActBlue's claim, but it rested on a clearly erroneous factual finding.

### B. The Texas Attorney General did not purposefully avail himself of a Massachusetts forum.

For similar reasons, ActBlue did not demonstrate purposeful availment. Courts considering purposeful availment evaluate "whether the defendant's in-state contacts represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." *A Corp.*, 812 F.3d at 59 (citation modified). The district court's brief

[5] The CIDs were served solely on ActBlue's Texas-based counsel via email. *See* App.359, 366. ActBlue alleges that the RTEs directed that documents "be produced for inspection and copying during normal business hours at your principal office or place of business." App.025. "ActBlue responded to Paxton's RTEs both by placing legal holds on ActBlue's records and making three productions of documents to Paxton on February 23, March 22, and April 29, 2024." App.026.

discussion of personal jurisdiction does not address purposeful availment. App.665–66. For this reason alone, the preliminary injunction should be vacated.

Regardless, in determining purposeful availment, "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *A Corp.*, 812 F.3d at 60 (quoting *Walden v. Fiore*, 571 U.S. 277, 290 (2014)). The purposeful availment inquiry turns on "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285.

The question is whether that defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," or whether the relationship to the forum is being driven by the plaintiff. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citation omitted).

In this case, ActBlue is "the only link between" Attorney General Paxton and Massachusetts, *Walden*, 571 U.S. at 285, so he has not purposefully availed himself of the benefits or protections of a Massachusetts forum. Attorney General Paxton did not purposefully avail himself of Massachusetts law by investigating Texas-registered foreign corporations for violations of Texas law committed in Texas, sending investigative demands to registered agents and counsel based in Texas, or filing a Texas enforcement action in Texas state court. ActBlue's choice of Massachusetts domicile, document storage, and donation-processing infrastructure cannot serve as Defendant's forum contacts. *Id.*; *John Crane, Inc.*, 891 F.3d at 696 ("directing pleadings, discovery, and other litigation communications to [a

Massachusetts] citizen facing suit in some other state . . . is simply not the same as targeting that citizen *in* [*Massachusetts*].").

"Jurisdiction cannot be created by and does not travel with the plaintiff . . . wherever she goes." *Harlow v. Children's Hosp.*, 432 F.3d 50, 63 (1st Cir. 2005). ActBlue's decision to process donations and store documents in Massachusetts—where the "effect" of the Texas lawsuit may be felt—is a "unilateral activity" that does not constitute Attorney General Paxton "invoking the benefits and protections" of Massachusetts' laws. *See id.* at 58.

### C. Exercising jurisdiction in Massachusetts is unreasonable.

Courts assessing reasonableness generally consider: "(1) the defendant's burden of appearing [in the forum state], (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." *A Corp.*, 812 F.3d at 61 (cleaned up).

Massachusetts' interest is, at best, minimal. This case concerns enforcement of a Texas statute in Texas state court for acts taken in Texas by Texas-registered foreign corporations. App.270–76. ActBlue's claims are based on the federal Constitution, not the Massachusetts Constitution.

Resolving this dispute in Texas promotes judicial efficiency. ActBlue's claims require detailed consideration of the DTPA and related Texas state-court precedent. "[F]ederal judges sitting in [Texas] are better qualified to construe [Texas] law, and to assess the character of [Texas's] probable enforcement of that law, than are judges

sitting elsewhere." *Leroy v. Great W. United Corp.*, 443 U.S. 173, 186 (1979); *see also Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 480, 488 (5th Cir. 2008) (holding that an Arizona official's cease-and-desist letter to a Texas company did not establish personal jurisdiction and warning that allowing such jurisdiction would let plaintiffs challenge one state's laws in another, undermining state independence).

The district court's analysis confirms this fact. Despite opining on the validity of the Texas-law claims brought by the Consumer Protection Division, the district court did not cite a single Texas case or statute (or even the DTPA itself) in its order granting a preliminary injunction. App.661–75.

Finally, Plaintiffs can "obtain[] convenient and effective relief" in Texas. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). Litigating jurisdiction and venue in Massachusetts makes this case less effective than litigating only in the original Texas state court case or in a Texas federal court. *See, e.g.*, *Ins. Co. of N. Am. v. Marina Salina Cruz*, 649 F.2d 1266, 1273 (9th Cir. 1981) (objection to litigating in one forum renders it less "effective"). And Texas courts are fully able to adjudicate ActBlue's First Amendment retaliation claims.

* * *

The Consumer Protection Division brought Texas law claims against ActBlue in a Texas court based on its misconduct in Texas. The facts underlying these claims have nothing to do with Massachusetts. The district court erred by exercising specific personal jurisdiction over Attorney General Paxton in Massachusetts.

The precedential consequences of the personal jurisdiction holding reach far beyond the parties and issues in this case. If personal jurisdiction could be exercised

in this case, then it could be exercised over any State's attorney general who has ever served investigative documents on a company headquartered out of state.

## III. Venue Is Improper in Massachusetts.

In a single sentence in a footnote, the district court found that venue exists for the same reasons as personal jurisdiction. App.666 n.5. Venue is proper only where the case "falls within one of the three categories set out in [28 U.S.C.] § 1391(b)"; otherwise "venue is improper, and the case must be dismissed or transferred under § 1406(a)." *Atl. Marine Constr. Co. v. U.S. Dist. Ct.*, 571 U.S. 49, 56 (2013). None applies.

Two categories are facially inapplicable in this case. Section 1391(b)(1) provides that venue may be proper if the defendant is a resident "of the State in which the district is located." The Texas Attorney General does not reside in Massachusetts. Section 1391(b)(3) applies only "if there is no district in which an action may otherwise be brought as provided in this section." Attorney General Paxton is a resident of Texas, so ActBlue may establish proper venue in Texas under § 1391(b)(1).

Venue in Massachusetts can thus rest only on § 1391(b)(2), which provides that venue may be proper in a district "in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."

The first page of the district court's order correctly identifies the events giving rise to ActBlue's claim: "initiation of an allegedly sham lawsuit against ActBlue in the state court of Texas." App.661; *see also* App.665 (noting ActBlue's "alleg[ation]

that Paxton had brought the state action as retaliation against ActBlue"). The event giving rise to ActBlue's claim was the filing of the Texas lawsuit, which occurred entirely in Texas and not in Massachusetts.

The only acts identified by district court—sending RTEs and CIDs several years earlier, App.665–66—are not a "substantial part of the events or omissions giving rise to [ActBlue's First Amendment retaliation] claim," which is based only on the filing of the Texas lawsuit. Venue is thus improper under § 1391(b)(2).

Because venue is improper in Massachusetts, "the case must be dismissed or transferred under § 1406(a)." *Atl. Marine Constr.*, 571 U.S. at 56.

## IV. The District Court Erred in Entering a Preliminary Injunction.

Even if personal jurisdiction were established, *Younger* abstention inapplicable, and venue proper, entry of a preliminary injunction was still erroneous because ActBlue failed to establish a likelihood of success on its First Amendment retaliation claim and the equities disfavor relief.

### A. ActBlue is unlikely to succeed on the merits of its claims.

The district court, for "the same reasons previously discussed, f[ound] that ActBlue has established a likelihood of success on the merits." App.673. That was error.

To establish First Amendment retaliation, a plaintiff must show that "(1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d

26, 43 (1st Cir. 2012). "The defendant may then avoid a finding of liability by showing that 'it would have reached the same decision . . . even in the absence of the protected conduct.'" *Id.*

### 1. The *Hartman* and *Nieves* framework should govern the Attorney General's civil enforcement of the DTPA.

To avoid interference with prosecutorial decisions and to respect the presumption of regularity, the Supreme Court has adopted strict rules governing retaliation claims. For retaliatory prosecution claims, the plaintiff must "[d]emonstrat[e] that there was no probable cause for the underlying criminal charge." *Hartman v. Moore*, 547 U.S. 250, 261 (2006). For retaliatory arrests, even in the presence of probable cause, a plaintiff may also "presen[t] objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 587 U.S. at 407.

When enforcing a consumer-protection lawsuit on behalf of the public, the Attorney General is effectively exercising a prosecutorial role. Surveying cases, the Eleventh Circuit correctly held that courts must "consider[] whether the underlying civil lawsuit was frivolous before allowing a plaintiff to move forward on a § 1983 First Amendment retaliation claim predicated on that civil lawsuit." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1300 (11th Cir. 2019).

The Eleventh Circuit correctly held that "[b]ased on the factors discussed in the Supreme Court's *Hartman* and *Nieves* decisions, . . . the presence of probable cause will generally defeat a § 1983 First Amendment retaliation claim based on a civil lawsuit as a matter of law." *Id.* at 1304. The Eleventh Circuit thus applies an

"objective, lack-of-probable-cause requirement to a § 1983 First Amendment retaliation case predicated on the filing of a civil lawsuit." *Id.* at 1306.[6] This is a low bar: "Probable cause to institute civil proceedings requires no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication." *Id.* at 1300–01 (quoting *Prof'l Real Est. Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 62–63 (1993) (internal quotation marks and alterations omitted)).

Applying this standard, ActBlue's First Amendment retaliation claim fails. As discussed, the Consumer Protection Division had far more than a reasonable belief that the claim would be held valid upon adjudication. *Supra* 5–8, 22–24. The district court's findings confirm the division's belief that ActBlue misrepresented the services it offered, App.668 n.6, and thus violated the Texas DTPA. Because the Consumer Protection Division had more than probable cause to institute civil proceedings against ActBlue, it cannot be liable for retaliation, and ActBlue has no likelihood of success.

**2. The district court's findings are erroneous.**

ActBlue's claim requires it to show that "'retaliatory animus' was the 'but-for' cause of [ActBlue's] injuries, 'meaning that the adverse action against [ActBlue] would not have been taken absent the retaliatory motive." *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 514 (1st Cir. 2023) (quoting *Nieves*, 587 U.S. at 398–99).

---

[6] The Sixth Circuit has described the application of this framework as an open question in the circuit. *Tamm v. Nerad*, No. 24-1155, 2025 WL 2674302, at *8 (6th Cir. Sept. 18, 2025). The Ninth Circuit has declined to extend *Nieves* "to [a] habeas challenge to [a] bond revocation." *Bello-Reyes v. Gaynor*, 985 F.3d 696, 700 (9th Cir. 2021).

A district court abuses its discretion when it "ignores criteria that deserve significant weigh[t] or gauges only the appropriate criteria but makes a clear error of judgment in assaying them." *Rosario-Urdaz*, 350 F.3d at 221.

The district court found that the "true motivation" for the lawsuit was Attorney General Paxton's "candidacy for [the] Senate," App.670, particularly (1) "ActBlue's efforts to fund Talarico's campaign," App.671, and (2) an FEC filing on April 15, 2026, App.665. But the district court's conclusion is refuted by its other findings.

The Office of the Attorney General began investigating ActBlue in December 2023, App.662, years before Attorney General Paxton announced his candidacy for Senate. The Office served CIDs in July 2024, App.663, and the Attorney General "submitted a Petition for Rulemaking to the Federal Election Commission (FEC), detailing his investigative findings and seeking amendments to the rules regarding donor verification," App.663. Congress also investigated ActBlue in 2024. App.663. Investigation into ActBlue's fundraising began long before the current Texas Senate race.

Moreover, the investigation that formed the basis for the state-court claims began in February 2026, when investigators confirmed the falsity of ActBlue's previous representation that it "no longer accept[s] gift card donations." App.663. After that, the New York Times published its own investigation on April 2 into ActBlue's misrepresentations to Congress. App.664.

The district court's inference that the state-court lawsuit arose solely in response to an April 15 FEC filing, *see* App.667–71, is inconsistent with the undisputed facts that the Office of the Texas Attorney General, Congress, and the media have long

investigated and expressed concerns about ActBlue's questionable fundraising practices. The district court's inference from the timing of the FEC filing is untenable.

And as discussed, the district court misinterpreted the statements by Attorney General Paxton on which it relied in determining that the Consumer Protection Division's harbored subjective bad faith in filing its DTPA lawsuit against ActBlue. *Supra* 30–33.

### 3. The district court misapplied *Mt. Healthy* and wrongly rejected the Attorney General's defense.

Even if a plaintiff can establish retaliatory animus as a motivating factor, a defendant is not liable if "it would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy*, 429 U.S. at 287. Despite acknowledging that the Attorney General argued this defense in his brief and at oral argument, App.673 n.8, the district court failed to apply the *Mt. Healthy* framework. It rejected this argument in a three-sentence footnote without addressing the substance of the defense.

The district court first stated that "even under *Mt. Healthy*, it is not open to the government to impinge on political speech." App.673–74 n.8. What the court meant by this statement is unclear. To the extent that the district court is suggesting that the Attorney General's motivation for enforcing the DTPA is irrelevant to a First Amendment claim, that is incorrect. Liability exists only where expressive conduct is a "motivating factor," and a lack of causation is a complete defense. *Mt. Healthy*, 429 U.S. at 287.

The district court then stated that "*Mt. Healthy* defines the (limited) right of a government employer to prohibit speech by its employees on matters not involving issues of public concern that may interfere with its ability to efficiently perform the services it provides to the public." App.674 n.8 (citing *Mt. Healthy*, 429 U.S. at 284). According to the court, *Mt. Healthy* "has nothing to do with government attempts to regulate or suppress (or retaliate against) the speech of private actors." App.674 n.8 (citing *Klen v. City of Loveland*, 661 F.3d 498, 508 (10th Cir. 2011) regarding the public-concern test). But the district court misread *Mt. Healthy* by looking only at its discussion of whether speech was protected. *See* 429 U.S. at 284 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968), and "accept[ing] the District Court's finding that the communication was protected by the First and Fourteenth Amendments").

On the following page, the Supreme Court turned to the key causation issue: "We are thus brought to the issue whether, even if [the defendant would have reached the same decision in the absence of the protected conduct], the fact that the protected conduct played a 'substantial part' in the actual decision not to renew would necessarily amount to a constitutional violation justifying remedial action." *Id.* at 285.

The Supreme Court ultimately adopted a two-step causation framework, which includes the defense raised by the Attorney General in this case:

> [T]he burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor" or to put it in other words, that it was a "motivating factor" in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it

> would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.

*Id.* at 287. The district court apparently overlooked this portion of the opinion, and its causation analysis failed to follow the *Mt. Healthy* framework. As in *Mt. Healthy*, the district court "should have gone on to determine whether the [Attorney General] had shown by a preponderance of the evidence that it would have reached the same decision as to [filing the DTPA claim] even in the absence of the protected conduct." *Id.*

Because the district court applied the wrong legal standard by failing to apply the *Mt. Healthy* framework (and erroneously refused to consider the Attorney General's defense under it), the court necessarily abused its discretion by entering the preliminary injunction. *See, e.g.*, *Rosario-Urdaz*, 350 F.3d at 221 ("An error of law is, of course, an abuse of discretion.").

### B. ActBlue will not be irreparably harmed without the injunction.

ActBlue will not suffer irreparable harm absent the injunction. As discussed, ActBlue is fully capable of raising its First Amendment defenses (and any other defenses) before the state court. And to the extent ActBlue seeks injunctive relief to shield it from the ordinary aspects of participating in litigation, the "time and expense of litigation" is not considered a "substantial and irreparable injury warranting an injunction." *Tejidos de Coamo, Inc. v. Int'l Ladies' Garment Workers' Union*, 22 F.3d 8, 14 (1st Cir. 1994); *see also Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."); *Younger*, 401 U.S. at 46

("the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term.").

ActBlue was not subject to any temporary restraining order in the state court proceeding. Indeed, the parties were in the process of discovery in the state suit before a temporary injunction hearing (the Texas law equivalent of a federal preliminary injunction) when the district court entered the preliminary injunction. ActBlue identified no irreparable harm sufficient to support receiving injunctive relief.

### C. The remaining equitable factors weigh against ActBlue.

Courts must also consider "whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs," and "the effect, if any, on the public interest." *Jean*, 492 F.3d at 26–27. "These factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King,* 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation modified).

The balance of harms and public interest favor Attorney General Paxton. As a constitutional officer exercising the sovereignty of the State of Texas, Tex. Const. art. IV, § 22, he has a significant interest in investigating Texas-law violations by foreign corporations registered in Texas, enforcing Texas statutes within Texas, and litigating those matters in Texas courts. States have a substantial interest in enforcing and investigating violations of their own laws within their own borders. Depriving

States of the ability to engage in these enforcement actions necessarily burdens this interest. A preliminary injunction against litigating in state court necessarily impedes this interest and inflicts "irreparable injury." *King*, 567 U.S. at 1303 (Roberts, C.J., in chambers). If the injunction is vacated, ActBlue will not suffer any significant burden but will be free to raise any applicable defense in state court. The equities favor Attorney General Paxton.

## Conclusion and Prayer

For these reasons, this Court should reverse the order granting a preliminary injunction and direct the district court to dismiss this case.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

/s/ William R. Peterson
William R. Peterson
Solicitor General
William.Peterson@oag.texas.gov

William F. Cole
Principal Deputy Solicitor General

Nathaniel A. Plemons
Assistant Solicitor General

*Counsel for Defendant-Appellant*

## Certificate of Compliance

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,123 words, excluding the parts of the brief exempted by Rule 32(f), according to the word count of Microsoft Word. This brief also complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity font.

/s/ William R. Peterson
William R. Peterson

## Certificate of Service

I hereby certify that this document, filed through the Court's CM/ECF system, will be served electronically through the Court's e-notification system to all participants registered for service through the Court's electronic system on August 17, 2026.

/s/ William R. Peterson
William R. Peterson

# ADDENDUM



| Document | Page # |
|---|---|
| Memorandum and Order on Plaintiffs' Motion for a Preliminary Injunction and Defendant's Motion to Dismiss | Add.02-16 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 26-11986-RGS

ACTBLUE LLC; ACTBLUE CIVICS, INC.;
ATS, INC.; and ACTBLUE CHARITIES, INC.

v.

WARREN KENNETH PAXTON, JR.,
in his official capacity as
Attorney General of the State of Texas

MEMORANDUM AND ORDER ON
PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION

June 11, 2026

STEARNS, D.J.

Plaintiffs ActBlue LLC; ActBlue Civics, Inc.; ATS, Inc.; and ActBlue Charities, Inc. (collectively, ActBlue) bring this action against Warren Kenneth Paxton, Jr., in his official capacity as Attorney General of the State of Texas, based on his initiation of an allegedly sham lawsuit against ActBlue in the state court of Texas. ActBlue asserts that Paxton filed the lawsuit – which asserts claims under the Texas Deceptive Practices Act (DTPA) – not with the purpose of vindicating Texans' rights as consumers but to retaliate against ActBlue for promoting and enabling campaign contributions to Democratic candidates for political office, including James Talarico, who is

now Paxton's opponent in a race for the seat in the United States Senate presently occupied by Republican Senator John Cornyn. Before the court is ActBlue's motion for a preliminary injunction. On June 4, 2026, the court convened an instructive and well-presented hearing on the motion. For the following reasons, the court will allow the substance of ActBlue's motion.[1]

## FACTUAL BACKGROUND

ActBlue is a prominent fundraising platform for Democratic candidates for public office, amassing as much as $19 billion in donations, mostly from small contributors, since its founding in 2004. Gilmer Decl. [Dkt # 14] ¶ 6. In December of 2023, Paxton began investigating ActBlue with the stated purpose of determining "whether ActBlue's operations are compliant with all applicable laws." Perla Decl. [Dkt # 12], Ex. 8. The next month, he served ActBlue with a Request to Examine (RTE) to be conducted at ActBlue's headquarters in Somerville, Massachusetts.[2] The RTE required ActBlue to make available for inspection a myriad of documents, including

---

[1] Because the court necessarily finds a likelihood of success on the merits of ActBlue's claims in allowing ActBlue's motion for a preliminary injunction, it follows that Paxton's motion to dismiss (which raises the same arguments upon which he unsuccessfully relies here) is <u>DENIED</u>.

[2] Although Paxton notes that the RTE was served on ActBlue's registered agent in Austin, Texas, he does not dispute that he also served copies on ActBlue in Massachusetts or that he conducted the relevant document review at ActBlue's Massachusetts headquarters.

those "sufficient to show [ActBlue's] policies for verifying the identity of persons who make political contributions through ActBlue's website(s)." Gilmer Decl., Exs. 1, 3, 5.

Although ActBlue complied with the RTE, on July 3, 2024, Paxton served ActBlue with a civil investigation demand (CID) seeking "all Communications using the phrase 'CVV' from January 1, 2024, to January 31, 2024," as well as "[d]ocuments sufficient to show all of ActBlue's changes in policy regarding the use of CVVs for Political Contributions between December 1, 2023, and July 1, 2024." *Id.*, Ex. 7. One month later, on August 8, 2024, Paxton issued a second CID, seeking "all Transaction Records regarding Political Contributions to ActBlue" made by six specified donors. *Id.*, Ex. 8. On October 21, 2024, Paxton submitted a Petition for Rulemaking to the Federal Election Commission (FEC), detailing his investigative findings and seeking amendments to the rules regarding donor verification.

One week later, Congress subpoenaed ActBlue for documents related to donor verification. ActBlue subsequently informed Congress that it had updated its policies and no longer accepted gift card donations. The parties dispute the accuracy of this representation.

Paxton's investigation lay dormant for the following year and a half. On February 18, 2026, James Talarico announced that his fledgling Senate

campaign had raised $2.5 million in a single day ($2.2 million of which originated through ActBlue). The following day, an investigator from the Texas Attorney General's Office made a $5 donation through ActBlue using a Mastercard gift card purchased with cash at a retail outlet under a pseudonym. Six days later, on February 25, 2026, a second investigator made two $10 donations to ActBlue using a Visa e-gift card. Investigators attempted to make several additional donations between February 19, 2026, and February 26, 2026, but ActBlue's payment system recognized these donations as originating from gift cards and did not process them.

On April 2, 2026, the *New York Times* published an article disclosing legal advice that ActBlue had received from its then-counsel, Covington & Burling LLP. At the June 4, 2026, hearing before this court, the Attorney General's Office represented that, despite having not read the underlying memoranda referenced in the *New York Times* article, it had concluded that the article revealed significant evidence of misconduct.[3] Given ActBlue's

[3] The court presumes that, by representing it had not read the Covington & Burling memoranda, the Attorney General's Office sought to avoid any attorney-client privilege issue inherent in the further disclosure of legal advice that ActBlue had received from its then-counsel, and over which it seemingly had not waived the privilege. The representation, however, raises its own concerns. The Attorney General's Office effectively admits that, despite purporting to base its lawsuit heavily on the information reported by the *New York Times* (an assertion the court does not credit for

invocation of attorney-client privilege, the court will not delve further into the contents of the article.

On April 15, 2026, candidate Talarico made an FEC filing reporting his net fundraising results during the first quarter of 2026. Five days later, on April 20, 2026, Paxton filed suit against ActBlue in Texas state court, asserting violations of the Texas DTPA. Paxton touted the lawsuit on several conservative podcasts and in his campaign emails during the following few days, linking it to ActBlue's fundraising for liberal Democrats and to his Senate candidacy.

ActBlue filed suit in this court on May 1, 2026, alleging that Paxton had brought the state action as retaliation against ActBlue for its facilitation of political donations to Democratic candidates (specifically, Talarico).

## DISCUSSION

### I. Personal Jurisdiction

Paxton argues that this court lacks specific personal jurisdiction over him in his official capacity because (1) he has not purposefully availed himself of Massachusetts as a forum, (2) ActBlue's claims do not arise out of any Massachusetts-based conduct, and (3) the exercise of jurisdiction is not

the reasons discussed below), it never fact-checked the reporting against the underlying documents.

reasonable as a matter of due process.[4] As the court intimated at the hearing, it finds no merit to these arguments. Paxton concedes that he served RTEs and CIDs on ActBlue in Massachusetts and that he conducted his review of responsive documents at ActBlue's Massachusetts headquarters. As the Texas action is undoubtedly related to these activities in Massachusetts, the exercise of jurisdiction is both reasonable and constitutional.[5]

## II. *Younger* Abstention

"[F]ederal courts have a 'virtually unflagging obligation' to adjudicate claims within their jurisdiction." *Am. Acad. of Pediatrics v. Uthmeier*, 2026 WL 1552734, at *12 (N.D. Ill. June 2, 2026), quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). In *Younger v. Harris*, 401 U.S. 37 (1971), however, the Supreme Court held that, notwithstanding this general rule, "principles of equity and comity demand that a federal court abstain from entertaining a suit that seeks to enjoin a state criminal prosecution [or quasi-criminal proceeding] as violative of federal law so long as the state proceeding affords an adequate opportunity

---

[4] Paxton does not argue that jurisdiction is lacking under the Massachusetts Long-Arm Statute. Given the breadth of that statute, this choice is wise.

[5] For much the same reason, Paxton's venue argument is also beside the mark.

to raise the federal defense and abstention will not cause irreparable harm." *Sirva Relocation, LLC v. Richie*, 794 F.3d 185, 191-192 (1st Cir. 2015).

Paxton argues that this court should abstain from entertaining ActBlue's lawsuit, which seeks to enjoin an ongoing quasi-criminal proceeding in state court, under the auspices of *Younger*. As ActBlue notes, however, courts have consistently held that *Younger* does not apply (as *Younger* itself held) "when a state proceeding is brought in bad faith, that is, for the purpose of harassment." *Id.* at 192. And while the court recognizes that the bad faith exception to *Younger* is very narrow in scope, it agrees with ActBlue that – regardless of whether the court applies an objective or subjective test – the evidence of bad faith is sufficiently overwhelming to qualify this as one of the rare cases where the exception should apply.

First, the timing of events alone speaks volumes about Paxton's underlying motivation. The investigation against ActBlue sat dormant for more than a year and a half, until the day after Talarico announced his fundraising results, when investigators from the Attorney General's Office began making several test attempts to donate to ActBlue using gift cards. *See Netflix, Inc. v. Babin*, 88 F.4th 1080, 1092 (5th Cir. 2023) (finding bad faith where a state court case "sat idle for a year" until Netflix filed a habeas petition, at which point "there was a burst of prosecutorial alacrity"). While

ActBlue concedes that three of these attempts were successful,[6] Paxton waited another two months, until Talarico filed his fundraising numbers with the FEC,[7] to file a lawsuit in Texas state court.

Second, the theory of harm underlying the consumer fraud claims rings hollow. When given the opportunity during the June 4 hearing, Paxton's Assistants were unable to articulate anything more concrete than the proposition that Texans, as a matter of principle, care deeply that businesses stay true to their word. *See Jolt Initiative, Inc. v. Paxton*, 821 F. Supp. 3d 706, 719 (W.D. Tex. 2026) (finding bad faith where, despite being "given multiple chances," Paxton could not identify any convincing evidence demonstrating that he had "a hope of succeeding in his quo warranto action"). This is not a compelling basis on which to premise a major lawsuit,

---

[6] ActBlue alleges that these attempts were only successful because the gift cards had been sourced through a major credit card provider and its processing vendor consequently failed to identify them as gift cards. The court expresses no opinion on the accuracy of this assertion, which appears more relevant to the question of whether ActBlue violated campaign finance laws (an issue which is not and cannot be raised in the state court proceeding) than whether it defrauded consumers. The issue of possible campaign finance violations by ActBlue (or WinRed) is not before this court.

[7] Paxton attempts to link his filing to the *New York Times* article, but the court is unconvinced. Not only is the FEC filing closer in time to the state court action, but Paxton also explicitly referenced the lawsuit in the context of his own fundraising efforts. Additionally, as the court previously discussed, *see supra* note 3, Paxton's Office concedes that it never fact-checked the *New York Times* article.

particularly given Paxton's well-known history of filing retaliatory lawsuits, *see, e.g.*, *id.*; *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025), and his failure to take any action on similar complaints filed against ActBlue's conservative analog, WinRed.

The court is also not persuaded, Paxton's remonstrations to the contrary, that the speech at issue here – which concerns the nature of the political donations that ActBlue solicits and accepts and the identities of the contributors (large and small) who use its platform – can reasonably be considered "commercial," such that it falls within the scope of the DTPA. Paxton seeks to portray ActBlue's platform as a product whose attributes have been misrepresented to consumers, but this framing does not withstand any close scrutiny. The platform does nothing more than facilitate political donations from private donors, who seek out its convenience, anonymity, and aggregation of the benefit bestowed on chosen political candidates. The facilitation of political donations reflects two types of protected speech: (1) ActBlue's own choice of which candidates or causes it will include on its platform, and (2) donors' individual choices to fund those candidates or causes with which the donor identifies. As the Supreme Court has reminded us more than once, "political speech [is] at the core of what the First Amendment is designed to protect." *Virginia v. Black*, 538 U.S. 343, 365

(2003); *see also Boos v. Barry*, 485 U.S. 312, 318 (1988) (noting that political speech "operates at the core of the First Amendment"). This is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964).

Third, Paxton's public statements in the wake of filing the case against ActBlue reveal his true motivation. While a prosecutor is entitled to a large degree of prosecutorial discretion and has a right to make a considered public accounting of his actions, Paxton did not hesitate in drawing a connection between the lawsuit and his candidacy for Senate. *See Am. Acad. of Pediatrics*, 2026 WL 1552734, at *23 (finding evidence of bad faith where defendant made pointed statements suggesting that he "not only had personal convictions against gender-affirming care, but also that those convictions affected his enforcement decisions and his decision specifically to initiate the state lawsuit at issue here"). On a podcast appearance the day he filed the action, for example, Paxton responded to a question about whether, "as part of this lawsuit," he could "collect information [from ActBlue] that applies to the whole country" with the statement, "I love that question because I am running for U.S. Senate. When in in [sic] the U.S. Senate, I'll be all over this." Perla Decl. ¶ 21(a), quoting The Charlie Kirk

Show, *Building the Red Wall + Virginia's Last Chance* (published Apr. 20, 2026). The next day, on a different podcast, he noted that ActBlue's funds "are largely going to liberal Democrats, and it's always been a mystery how they raised this much money." Perla Decl. ¶ 21(b), quoting Salcedo Storm Podcast, *Ken Paxton Outshines Republicans By Bringing Accountability to ACT Blue* (published Apr. 21, 2026).

His fundraising emails since filing the state action have been similarly explicit. He identifies ActBlue as "the Democrats' shadowy digital fundraising network," *see* Jones Decl. [Dkt # 51], Exs. 2 & 3, noting that it has raised billions of dollars for Democrats and, more specifically, "eye-popping sums online" for Talarico, *id.*, Ex. 5. The truth is plain and captured in Paxton's own declarations: The lawsuit was filed in retaliation for (and in an attempt to suppress) ActBlue's efforts to fund Talarico's campaign.

## III. Preliminary Injunction

Looking past the threshold considerations, the court turns to the heart of the matter: whether to issue a preliminary injunction. Courts consider the following factors when determining whether to do so: "(1) the movant's likelihood of success on the merits, (2) the potential for irreparable harm, (3) a balancing of the relevant equities, and (4) the effect on the public interest." *Campbell Soup Co. v. Giles*, 47 F.3d 467, 470 (1st Cir. 1995). "Likelihood of

success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996); *see also CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020) (Likelihood of success on the merits is the factor that "weighs most heavily in the preliminary injunction analysis."); *Ryan v. U.S. Immig. & Customs Enf't*, 974 F.3d 9, 20 (1st Cir. 2020) ("If the movant 'cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.'"), quoting *New Comm Wireless Servs. Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

*a. Likelihood of Success on the Merits*

"Under the First Amendment, retaliation claims proceed in two stages." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012). First, the plaintiff must prove that: (1) it "engaged in constitutionally protected conduct," (2) it "was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." *Id.* The burden then shifts to the defendant to prove that it "would have reached the same decision . . . even in the absence of the protected conduct." *Id.* (internal quotation marks and citations omitted).

For much the same reasons previously discussed, the court finds that ActBlue has established a likelihood of success on the merits. *See Jolt Initiative*, 821 F. Supp. 3d at 721 ("Where the allegation is that the state proceedings . . . were instituted in retaliation for or to deter the exercise of constitutionally protected rights, the question of the applicability of the *Younger* exception and that of the existence of a constitutional violation merge: to prove one is to prove the other."), quoting *Wilson v. Thompson*, 593 F.2d 1375, 1385 n.17 (5th Cir. 1979). ActBlue has engaged in protected conduct, namely, facilitating the donation of funds to political candidates on behalf of private donors. The lawsuit in Texas is undoubtedly an adverse action. And having previously found bad faith, the court agrees with ActBlue that the evidence in the record compels the conclusion that, far from protecting Texas consumers, the action was filed in retaliation for ActBlue's fundraising on behalf of Talarico, Paxton's current political rival for the Senate seat.[8]

---

[8] In his brief and at oral argument, Paxton asserts a defense under *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), arguing that he can defeat a claim of adverse impact on the First Amendment rights of ActBlue by showing that the suppression of protected expression was not his primary motivation in pursuing the case and that he would have taken the same action against ActBlue even in the absence of protected speech. *See* Def.'s Resp. to Mot. for a Prelim. Injunction [Dkt # 39] at 16, citing *Mt. Healthy*, 429 U.S. at 285. This argument fails in its fundamentals. First, even under *Mt. Healthy*, it is not open to the government to impinge on

*b. Remaining Factors*

The court's finding as to likelihood of success effectively resolves the remaining factors in ActBlue's favor. Even setting aside the chilling effect the lawsuit is meant to have on private donors to the Texas campaign and the diversion of ActBlue's resources elsewhere, the suppression of speech alone constitutes irreparable harm. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."), quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *Media Matters*, 732 F. Supp. 3d at 29 (rejecting the argument that a First Amendment injury is reparable merely because plaintiffs could bring their speech claims as an affirmative defense in the state court litigation).

---

political speech (even a "little bit," as Paxton's counsel would have it). *Cf. Reyes-Orta v. Puerto Rico Highway & Transp. Auth.*, 811 F.3d 67, 73 n.3 (1st Cir. 2016) (noting that, in the political discrimination context, evidence of pretext may suffice to defeat a *Mt. Healthy* defense, even where the government identifies a nondiscriminatory reason for its actions). But more to the point, *Mt. Healthy* defines the (limited) right of a government employer to prohibit speech by its employees on matters not involving issues of public concern that may interfere with its ability to efficiently perform the services it provides to the public. *See Mt. Healthy*, 429 U.S. at 284. The defense has nothing to do with government attempts to regulate or suppress (or retaliate against) the speech of private actors. *Cf. Klen v. City of Loveland*, 661 F.3d 498, 508 (10th Cir. 2011) (the public concern test applies only to claims brought by government employees; it does not apply to private citizens who are not part of the government workplace).

And as for the balance of hardship and public interest factors, which merge when the government is the opposing party, *see Nken v. Holder*, 556 U.S. 418, 435 (2009), there is an inherent public interest in ensuring that state officials respect the explicit guardrails set out in the U.S. Constitution, particularly when it comes to matters of political speech, *see Media Matters*, 732 F. Supp. 3d at 30 ("And 'there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation[.]'"), quoting *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).

**ORDER**

For the foregoing reasons, ActBlue's Motion for a Preliminary Injunction is ALLOWED. Paxton and each of his agents and employees are hereby ENJOINED and RESTRAINED from continuing to litigate the Texas state civil enforcement action, *State of Texas v. ActBlue LLC*, No. 096-376890-26 (Dist. Ct., Tarrant Cnty., Tex.), or from bringing any new state civil enforcement action premised on the same conduct.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE