**No. 26-1713**

# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

ACTBLUE LLC; ACTBLUE CIVICS, INC.;
ATS, INC.; ACTBLUE CHARITIES, INC.

*Plaintiffs-Appellees*,

*v.*

WARREN KENNETH PAXTON, JR., in his official capacity as Attorney General of the State of Texas,

*Defendant-Appellant.*

On Appeal from the United States District Court for the District of Massachusetts in Case No. 1:26-cv-11986-RGS Before the Honorable Richard G. Stearns

**BRIEF FOR PLAINTIFFS-APPELLEES ACTBLUE LLC, ET AL.**

MARK C. FLEMING
FELICIA H. ELLSWORTH
TIMOTHY J. PERLA
AMANDA MASSELAM STRACHAN
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

RONALD C. MACHEN
DANIEL S. VOLCHOK
MATTHEW T. JONES
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
daniel.volchok@wilmerhale.com

September 24, 2026

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs-appellees certify that there is no parent corporation of ActBlue LLC; ActBlue Civics, Inc.; ATS, Inc.; or ActBlue Charities, Inc., and no publicly held corporation owns 10 percent or more of any plaintiff's stock.

# TABLE OF CONTENTS


Page

CORPORATE DISCLOSURE STATEMENT ..... i

TABLE OF AUTHORITIES ..... iv

STATEMENT REGARDING ORAL ARGUMENT ..... xi

INTRODUCTION ..... 1

STATEMENT ..... 3

A. ActBlue ..... 3

B. Paxton's Adjudicated History Of Retaliatory Conduct ..... 6

C. Paxton's Investigation Of ActBlue ..... 9

D. Paxton's Texas Lawsuit ..... 14

E. This Action ..... 16

SUMMARY OF ARGUMENT ..... 18

STANDARD OF REVIEW ..... 22

ARGUMENT ..... 23

I. PAXTON'S THRESHOLD ARGUMENTS FAIL ..... 24

A. *Younger* ..... 24

B. Personal Jurisdiction ..... 43

C. Venue ..... 50

II. ACTBLUE WILL LIKELY SUCCEED ON THE MERITS ..... 51

III. THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR RELIEF ..... 57

A. ActBlue Will Suffer Irreparable Harm Without A Preliminary Injunction....57

B. The Equitable Factors Favor A Preliminary Injunction....59

CONCLUSION....60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### CASES

Page(s)

*A Corp. v. All American Plumbing*,
812 F.3d 54 (1st Cir. 2016)....................20, 43

*Adelson v. Hananel*,
510 F.3d 43 (1st Cir. 2007)....................50

*American Academy of Pediatrics v. Uthmeier*,
178 F.4th 1113 (7th Cir. 2026), *reh'g en banc granted*, 180 F.4th 1022, *appeal dismissed*, 2026 WL 2686175 (7th Cir. Sept. 14, 2026) ....................36

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)....................52

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)....................43, 44, 46

*Citizens United v. Federal Election Commission*,
558 U.S. 310 (2010)....................2, 58

*Collins v. Kendall County*,
807 F.2d 95 (7th Cir. 1986) ....................25

*Corporate Technologies, Inc. v. Harnett*,
731 F.3d 6 (1st Cir. 2013)....................22

*Cullen v. Fliegner*,
18 F.3d 96 (2d Cir. 1994) .................... 22, 25, 26, 31, 38, 40, 58, 59

*D.B. ex rel. Elizabeth B. v. Esposito*,
675 F.3d 26 (1st Cir. 2012)....................21, 51

*Defense Distributed v. Grewal*,
971 F.3d 485 (5th Cir. 2020) ....................47, 48

*Dobbs v. Jackson Women's Health Organization*,
597 U.S. 215 (2022)....................4

*Doe v. Boys Clubs of Greater Dallas, Inc.*,
907 S.W.2d 472 (Tex. 1995) ....................................................................38

*Doe v. Trump*,
157 F.4th 36 (1st Cir. 2025)....................................................................23

*Does 1-6 v. Mills*,
16 F.4th 20 (1st Cir. 2021)......................................................................23

*Dombrowski v. Pfister*,
380 U.S. 479 (1965)..........................................................................36, 40

*Dominguez-Cruz v. Suttle Caribe, Inc.*,
202 F.3d 424 (1st Cir. 2000)....................................................................32

*Dukes v. Wal-Mart Stores, Inc.*,
2013 WL 1282892 (N.D. Cal. Mar. 26, 2013) ............................................34

*El Dia, Inc. v. Puerto Rico Department of Consumer Affairs*,
413 F.3d 110 (1st Cir. 2005)....................................................................40

*Elrod v. Burns*,
427 U.S. 347 (1976)..................................................................................57

*Fitzgerald v. Peek*,
636 F.2d 943 (5th Cir. 1981) ..............................................................35, 38

*Gomez v. Vernon*,
255 F.3d 1118 (9th Cir. 2001) ..................................................................34

*Gonzalez-Droz v. Gonzalez-Colon*,
573 F.3d 75 (1st Cir. 2009)......................................................................23

*Harris v. Quinn*,
573 U.S. 616 (2014)..................................................................................39

*Hartman v. Moore*,
547 U.S. 250 (2006).................................................................22, 54, 55, 56

*Huffman v. Pursue, Ltd.*,
420 U.S. 592 (1975).................................................................19, 25, 37, 41

*In re Powered By People & Robert Francis O'Rourke*, No. 15-25-00140-CV, 2025 WL 5094568 (Tex. App. Sept. 12, 2025) ........................8, 9, 33

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945)..........................................................................43

*John Crane, Inc. v. Shein Law Center, Ltd.*, 891 F.3d 692 (7th Cir. 2018) ..........................................................................49

*Jolt Initiative, Inc. v. Paxton*, 821 F.Supp.3d 706 (W.D. Tex. 2026) ................................ 7, 8, 20, 25, 26, 33, 39

*Ken-N.K., Inc. v. Vernon Township*, 18 F.App'x 319 (6th Cir. 2001) ..........................................................35, 36

*Krahm v. Graham*, 461 F.2d 703 (9th Cir. 1972) ..........................................................................25

*Lewellen v. Raff*, 843 F.2d 1103 (8th Cir. 1988) ..............................................20, 25, 35, 37

*Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018)..........................................................................1, 51

*McCutcheon v. Federal Election Commission*, 572 U.S. 185 (2014)..........................................................................2, 51

*Media Matters for America v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025)...............................................7, 20, 33, 47, 52, 58

*Media Matters for America v. Paxton*, 732 F.Supp.3d 1 (D.D.C. 2024)..........................................................7, 33

*Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 (1982)..........................................................................37

*Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977)..........................................................................57

*Mullin v. Doe*, 146 S.Ct. 2121 (2026)..........................................................................23

*Murthy v. Missouri*,
603 U.S. 43 (2024)........................................................................................23

*National Rifle Association of America v. Vullo*,
602 U.S. 175 (2024)......................................................................................51

*Netflix, Inc. v. Babin*,
88 F.4th 1080 (5th Cir. 2023) ............................ 22, 25, 26, 30, 32, 33, 40, 58, 59

*New Orleans Public Service, Inc. v. Council of City of New Orleans*,
491 U.S. 350 (1989)......................................................................................24

*Nieves v. Bartlett*,
587 U.S. 391 (2019)..............................................................................22, 55, 56

*Nobby Lobby, Inc. v. City of Dallas*,
970 F.2d 82 (5th Cir. 1992) ..........................................................................25

*Perez v. Ledesma*,
401 U.S. 82 (1971)........................................................................................37

*Pritzker v. Yari*,
42 F.3d 53 (1st Cir. 1994)..............................................................................44

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
487 U.S. 781 (1988)......................................................................................40

*Rowe v. Griffin*,
676 F.2d 524 (11th Cir. 1982) ......................................................................35

*Sawtelle v. Farrell*,
70 F.3d 1381 (1st Cir. 1995)..........................................................................46

*Scottsdale Capital Advisors Corp. v. The Deal, LLC*,
887 F.3d 17 (1st Cir. 2018)............................................................................45

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*,
699 F.3d 1 (1st Cir. 2012)..............................................................................57

*Sirva Relocation, LLC v. Richie*,
794 F.3d 185 (1st Cir. 2015)..................................................................19, 24, 25

*Smith v. Armour Pharmaceutical Co.*,
838 F.Supp. 1573 (S.D. Fla. 1993) ............................................................34

*Sprint Communications, Inc. v. Jacobs*,
571 U.S. 69 (2013)............................................................................24, 37

*Ticketmaster-New York, Inc. v. Alioto*,
26 F.3d 201 (1st Cir. 1994)......................................................................49

*Timmerman v. Brown*,
528 F.2d 811 (4th Cir. 1975) ....................................................................25

*Uffner v. La Reunion Francaise, S.A.*,
244 F.3d 38 (1st Cir. 2001)................................................................ 50-51

*United Books, Inc. v. Conte*,
739 F.2d 30 (1st Cir. 1984)......................................................................36

*United States v. Bowles*,
751 F.3d 35 (1st Cir. 2014)......................................................................32

*United States v. Fitzpatrick*,
67 F.4th 497 (1st Cir. 2023)......................................................................43

*United States v. Zannino*,
895 F.2d 1 (1st Cir. 1990)........................................................................54

*United States v. Zorrilla-Echevarria*,
723 F.3d 298 (1st Cir. 2013)......................................................................23

*Walden v. Fiore*,
571 U.S. 277 (2014)....................................................................46, 48, 49

*Wilson v. Thompson*,
593 F.2d 1375 (5th Cir. 1979) ..............................................................25, 35

*Yelp Inc. v. Paxton*,
137 F.4th 944 (9th Cir. 2025) ....................................................................42

*Younger v. Harris*,
401 U.S. 37 (1971)...................................................2, 20, 24, 34, 35, 40

## DOCKETED CASES

*State of Texas v. O'Rourke*, No. 348-367652-25 (348th Dist. Ct., Tarrant Cnty., Tex.) ....................8, 33

## STATUTES

28 U.S.C. §1391(b)(2)....................21, 50

Texas Business & Commerce Code §17.46(a) ....................14, 38

Texas Business Organizations Code
§12.151....................10
§12.155....................10

Texas Civil Practice & Remedies Code §27.010(a) ....................59

## RULES

Federal Rule of Evidence 404(b)(2) ....................20, 32

## OTHER AUTHORITIES

*About the Attorney General*, Texas Attorney General (Sept. 21, 2026), https://www.texasattorneygeneral.gov/about-office....................28

ActBlue, *ActBlue's November 2023 Letter to Congress Accurately Described Its Robust Vetting of Contributions by Americans Overseas* (Sept. 12, 2026), available at https://www.actblue.com/wp-content/uploads/2026/09/ActBlue-White-Paper-and-Letter-to-Congress-September-12-2026.pdf....................13

Amendments of Rules Regarding Contributions from Untraceable Electronic Payment Methods, REG 2024-08, Federal Election Commission, https://www.fec.gov/legal/rulemakings/2024-08/?doc_id=425690 ....................11

Arcand, Cameron, *Texas AG Investigates Beto O'Rourke PAC over support for quorum-breaking lawmakers*, Fox News (Aug. 8, 2025), https://www.foxnews.com/politics/texas-ag-investigates-beto-orourke-pac-over-support-quorum-breaking-lawmakers ....................8

*Chairman Steil Releases Finding from Subpoena of ActBlue*, United States Committee on House Administration (Dec. 10, 2024), https://republicans-cha.house.gov/2024/12/chairman-steil-releases-findings-from-subpoena-of-actblue ....................27

*Having Trouble Donating?*, WinRed Help Ctr. (Sept. 21, 2026), https://support.winred.com/en/articles/4387409-having-trouble-donating....................33

Scherer, Jasper, *Texas AG Ken Paxton Officially Joins U.S. Senate Race Challenging John Cornyn*, Tex. Trib. (Apr. 8, 2025), https://www.texastribune.org/2025/04/08/ken-paxton-john-cornyn-us-senate-texas-republican-primary/.................... 11-12

## STATEMENT REGARDING ORAL ARGUMENT

Because the district court's decision was plainly correct, oral argument is unnecessary, but counsel for ActBlue stands ready to present oral argument if that would assist the Court.

## INTRODUCTION

For nearly three years, Texas Attorney General Ken Paxton, a Republican, has pursued a vendetta against plaintiffs (collectively "ActBlue") because ActBlue is critical to Democratic fundraising. And in parallel with his candidacy for the U.S. Senate, Paxton recently escalated his harassment campaign: Shortly after Paxton's Democratic Senate opponent James Talarico announced record-breaking fundraising numbers—which he achieved primarily using ActBlue—Paxton sued ActBlue in Texas state court, alleging it misrepresented its fraud-protection policies. He also made the partisan basis of his antipathy for ActBlue clear, trumpeting the suit in the media by saying that "ActBlue funds primarily left-wing campaigns" and "has raised billions of dollars for liberal causes" and "liberal Democrats."

ActBlue filed this lawsuit to stop Paxton's abuse of power. Concluding that Paxton's "true motivation" for his Texas lawsuit was bad-faith "retaliation for" ActBlue's political activities—core First Amendment conduct—the district court preliminarily enjoined Paxton from proceeding with that litigation.

That decision was well within the court's discretion. "[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). The assistance ActBlue provides to the political candidates it chooses to

support and to their donors is not merely protected, but central to self-government: "There is no right more basic in our democracy than … participat[ing] in electing our political leaders," including by "contribut[ing] to a candidate's campaign." *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014) (plurality). And as the district court found, "overwhelming" evidence establishes that Paxton sued ActBlue in bad faith to punish and "suppress" its exercise of that fundamental right. Indeed, Paxton's own investigation revealed that his core allegation is false; ActBlue does not misrepresent its policies.

Paxton's brief has no serious response to all this, focusing instead on threshold arguments. But there was no barrier to a preliminary injunction. Because Paxton instituted the Texas action in bad faith, *Younger v. Harris*, 401 U.S. 37 (1971), and its progeny did not preclude the district court from enjoining it. And Paxton's repeated efforts to harass ActBlue in Massachusetts amply support personal jurisdiction and venue. Finally, what little Paxton does say about the preliminary-injunction factors is baseless: He misrepresents the record to claim that ActBlue has conceded wrongdoing and otherwise relies on forfeited arguments and immaterial quibbles with the district court's factual findings.

The First Amendment "has its fullest and most urgent application" to speech "uttered during a campaign for political office." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010). The district court did not remotely abuse its discretion in issuing

a preliminary injunction to protect bedrock First Amendment rights, and this Court should put an end to Paxton's partisan assault on the Constitution by affirming.

## STATEMENT

### A. ActBlue

1. ActBlue LLC is a non-profit political action committee (PAC) organized under Massachusetts law and headquartered in Boston. App.322. The other appellees—ActBlue Civics, Inc.; ATS, Inc.; and ActBlue Charities, Inc.—are also based in Massachusetts and organized under Massachusetts law. App.322-323.

ActBlue operates an online fundraising platform for individuals to make political donations. App.323. Unlike some PACs, ActBlue does not pool funds and direct them to candidates. *Id*. It is instead a conduit: Donors contribute to candidates and organizations on ActBlue's platform, and ActBlue processes the contributions and transmits them to the recipients. *Id*. ActBlue conditions use of its platform on agreement to certain terms, including a Massachusetts forum-selection clause. App.650.

ActBlue offers its services only to Democratic and progressive candidates, causes, and organizations. App.323. Before a candidate (or other entity) may solicit and receive donations through ActBlue's platform, ActBlue conducts vetting to ensure the candidate or entity is aligned with ActBlue's political

viewpoints. App.323, 697. Since its founding in 2004, ActBlue has become a major means by which Americans engage in politics, and a critical fundraising tool for Democrats: It has facilitated nearly $19 billion in contributions from millions of donors, with an average donation of approximately $40. App.323-324.

A disproportionate number of donations made through ActBlue come in the immediate aftermath of high-profile political events. For example, in the week following the issuance of *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), donors contributed more than $88 million through ActBlue across almost 2 million transactions, $57 million more than in the previous week. App.323-324.

2. Although candidates and organizations receiving contributions are responsible for ensuring that those contributions are lawful, ActBlue maintains robust safeguards to prevent unlawful contributions. App.373-374, 651. For example, ActBlue's fraud-detection software evaluates every contribution for 140 risk signals, including the payment method, card history, and various behavior indicators, and it automatically blocks transactions coded as fraudulent. App.373-374. ActBlue staff also manually review transactions the software flags as high-risk, to ensure compliance with legal requirements and ActBlue policies. App.374. In addition, ActBlue retains external auditors to review its transaction-processing systems, and it is certified as a Level 1 service provider under the Payment Card

Industry Data Security Standard, meaning it processes over six million transactions annually while maintaining the highest compliance and security standards. App.374; App.17.

ActBlue regularly reviews and updates its compliance safeguards to reflect evolving industry standards and address emerging threats. In 2024, for instance, ActBlue began requiring credit card verification values (CVVs) for first-time donors (and returning donors whose payment information had not been saved). App.374. And in 2025, ActBlue implemented new prophylactic measures to prevent donations by persons located in non-U.S. countries. *Id*.

ActBlue also maintains and enforces policies to prevent fraudulent donations made with gift cards and prepaid debit cards. App.374, 651. Although federal law permits contributions using these methods of payment, their use can make verifying the identities of donors difficult, particularly with non-reloadable and anonymous cards. *Id*. To guard against any risk of fraud these cards pose, ActBlue adopted policies in 2024 of automatically rejecting contributions its anti-fraud software identifies as having been made with gift cards and certain prepaid cards, including non-reloadable and anonymous cards. App.651-652. By contrast, *reloadable* prepaid debit cards do not pose the same challenges, because they are designed for repeated use and often linked to an identifiable account, billing address, or administering institution. App.374. Accordingly, ActBlue does not

automatically reject contributions made using reloadable prepaid debit cards, instead subjecting those donations to its standard fraud-prevention assessment. *Id.*

3. ActBlue's Republican-aligned counterpart is called WinRed. App.208. Like ActBlue, WinRed acts as a conduit, linking donors with Republican candidates and organizations. App.207-208. In recent years, WinRed has come under scrutiny for its fundraising tactics, including its practice of making some donations automatically recurring unless the donor manually opts out. App.207-215, 218-219. The practice caused many donors to make repeated donations inadvertently and, in part for that reason, WinRed accounts associated with the Trump 2020 campaign had to refund 10.7% of the money they raised. App.207-208. The equivalent Biden 2020 affiliated accounts on ActBlue had to refund only 2.2% of the money they raised. App.208.

Following reporting on these issues, the attorneys general for New York, Connecticut, Minnesota, and Maryland opened investigations into both WinRed and ActBlue. App.218-219.

**B. Paxton's Adjudicated History Of Retaliatory Conduct**

Courts have repeatedly held that Paxton violated the First Amendment by using his office to punish speech and political activity with which he disagrees.

For example, in 2023, Media Matters reported that "advertisements for major corporations" on X.com "were appearing next to extremist content," such as

"images of Adol[f] Hitler." *Media Matters for America v. Paxton*, 732 F.Supp.3d 1, 8 (D.D.C. 2024). The article engendered outrage from X.com owner Elon Musk, and although the reporting had no connection to Texas, it prompted Paxton to declare that he was investigating Media Matters—which he dubbed a "radical left-wing organization"—for possible violations of the Texas Deceptive Trade Practices Act (DTPA). *Id.* at 9-10. Paxton then issued a Civil Investigative Demand (CID) seeking "a host of records" from Media Matters. *Id.* at 8. A district court enjoined Paxton from enforcing the CID on the ground that it constituted First Amendment retaliation. *Id.* at 27-30. Affirming the injunction, the D.C. Circuit concluded that Media Matters was "suffering from a campaign of retaliation against them in response to their exercise of their First Amendment rights." *Media Matters for America v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025).

Paxton was similarly found to have retaliated against Jolt Initiative, a non-profit focused on increasing civic participation by Latinos in Texas. *Jolt Initiative, Inc. v. Paxton*, 821 F.Supp.3d 706, 711, 713 (W.D. Tex. 2026). After a conservative media figure posted unverified (and promptly debunked) claims on social media that Jolt was registering non-U.S. citizens to vote, Paxton launched an investigation and demanded access to information about Jolt's volunteers and associates. *Id.* at 712-713. He then filed a state-court suit seeking to revoke Jolt's

corporate charter, which ended only after a federal court enjoined it, holding that Paxton had initiated the suit to retaliate against Jolt's protected political activities. *Id.* at 714, 718-720.

Paxton has also targeted organizations associated with Democratic Party fundraising. Last year, he began investigating Powered by People, a PAC associated with Texas Democrat Beto O'Rourke that reportedly has received "a significant number of … donations through individuals by platforms like ActBlue." Arcand, *Texas AG Investigates Beto O'Rourke PAC over support for quorum-breaking lawmakers*, Fox News (Aug. 8, 2025); *see* App.195-196. Paxton accused the group of paying "bribe[s]" to Democratic legislators and declared that "[a]ny Democrat coward breaking the law by taking a Beto Bribe will be held accountable." App.195. He then demanded sensitive documents and communications, App.196, and sued Powered by People and O'Rourke under the DTPA, seeking an injunction to prevent the group from engaging in certain fundraising activities, *see State of Texas v. O'Rourke*, No. 348-367652-25 (348th Dist. Ct., Tarrant Cnty., Tex.). Although the case is ongoing, the Texas Court of Appeals has already deemed it "far from clear" that Powered by People's conduct violates the DTPA. *In re Powered By People & Robert Francis O'Rourke*, 2025 WL 5094568, at *6 (Tex. App. Sept. 12, 2025). It also vacated a trial court order granting Paxton preliminary relief, concluding that the order "violate[d]" Powered

by People's "right[] to free speech." *Id.* at *7. Paxton initiated a similar investigation into Texas Majority PAC, a group associated with Democratic donor George Soros. App.198. Paxton has described that PAC as a "far-left organization[]," asserting that it might be bribing "Democratic legislators." App.198. He has demanded documents from the organization and accused it of "potentially unlawful activity." App.199.

Other examples of Paxton targeting organizations he opposes politically are legion. He has recently investigated and/or sued organizations that provide food, shelter, and other services to migrants; an LGBTQ+ advocacy organization; and a Muslim advocacy organization, among others. Texas Civic and Non-Profit Organizations Brief (Dkt.34) at 4-9 & n.4, *ActBlue LLC v. Paxton*, No. 1:26-cv-11986-RGS (D. Mass. May 27, 2026).

Paxton has not undertaken any investigation into WinRed—which he uses for his own fundraising, App.231—despite reports that it engaged in improper fundraising practices and despite the investigations of other state attorneys general covering both groups. App.218-219.

### C. Paxton's Investigation Of ActBlue

Paxton began investigating ActBlue in December 2023, purportedly "to determine whether ActBlue's operations are compliant with all applicable laws." App.201. To further that open-ended inquiry, Paxton served a form of legal

process known as a "request to examine," or RTE, on ActBlue LLC; ActBlue Civics, Inc.; ActBlue Technical Services, Inc. (now ATS, Inc.); and ActBlue Charities, Inc. App.324-325; App.315, 328, 338, 349. Texas's RTE statute authorizes the Texas attorney general to "inspect, examine, and make copies" of "any record" of an entity doing business in Texas. Tex. Bus. Org. Code §12.151. Any entity that fails to comply with an RTE "forfeits the right … to do business in" Texas. *Id.* §12.155; *see* App.316, 329, 339, 350.

Each RTE was sent to ActBlue's then-headquarters in Somerville, Massachusetts, as well as its registered agent in Texas, and each ordered the recipient to make documents available "for inspection and copying" at its "principal office or place of business" or send them to Paxton by other means. App.315, 328, 338, 349. Paxton's requests were extensive: One RTE, for example, demanded ActBlue LLC's organizational chart, details about its fundraising and spending in Texas, its policies and procedures for verifying the identities of contributors, information on certain donors to ActBlue, and years of tax returns. App.321. ActBlue attempted to comply with Paxton's demands, placing legal holds on its records and making multiple productions using computers located in Massachusetts. App.26, 377-378.

Unsatisfied, Paxton issued CIDs to ActBlue in July and August 2024. The first demanded documents related to ActBlue's use of CVV codes, and the second

sought information about six donors. App.359-364, 366-372. Both CIDs requested that production be made either at ActBlue's principal place of business or in Texas. App.359, 366. On the day he sent the second CID, Paxton issued a press release touting the investigation and stating that a "major focus" was ActBlue's alleged "failure to require that donors provide 'CVV' codes when making donations by credit card." App.201. As Paxton's press release acknowledged, however, ActBlue had already "changed their requirements to now include 'CVV' codes for donations." *Id*. Regardless, ActBlue cooperated, producing documents stored in Massachusetts using Massachusetts-based computers. App.26, 378.

That October, Paxton announced that he had sent a rulemaking petition to the Federal Election Commission (FEC), "detailing how suspicious actors appear to be using ActBlue's political fundraising platform to make a large number of straw political donations." App.204. The FEC sought comments on the petition but did not otherwise act on it, *see* Amendments of Rules Regarding Contributions from Untraceable Electronic Payment Methods, REG 2024-08, Fed. Election Comm'n, and Paxton's investigation went silent.

Six months later (in April 2025), Paxton announced that he would challenge incumbent John Cornyn for the 2026 Republican Senate nomination. Scherer, *Texas AG Ken Paxton Officially Joins U.S. Senate Race Challenging John Cornyn*,

Tex. Trib. (Apr. 8, 2025). Nearly a year after that, Democratic Senate candidate James Talarico—Paxton's potential opponent in the general election—announced that his campaign had raised $2.5 million in a single day. App.27, 663-664. Of that sum, more than $2.2 million was contributed through ActBlue. App.28, 664.

The day after Talarico's announcement, Paxton—after 16 months of inaction—revived the ActBlue investigation. App.384-385, 558. In violation of ActBlue's Terms of Service, Paxton's investigator Ryan Hanlan donated money through ActBlue under a false name. App.547, 650-651. To make the donation, Hanlan used what he has described as a "MasterCard gift card purchased at a retail outlet." App.547. ActBlue's anti-fraud software identified the card as a prepaid *reloadable* debit card, so it did not automatically reject Hanlan's contribution. App.652. Multiple public databases unaffiliated with ActBlue—known as Bank Identification Number (BIN) databases—also identify the card as "PREPAID RELOADABLE" or "MASTERCARD PREPAID GENERAL SPEND." App.652.

Another Paxton investigator, Rock Robinson, initiated additional contributions over the following week, including one directly to ActBlue. App.649-650. ActBlue's system automatically rejected three of them after identifying those as coming from a "prepaid anonymous" card. App.653. Robinson subsequently initiated two contributions with what he says was a "Visa e-gift card purchased online." App.542. ActBlue's software identified the card as

a "business" debit card, consistent with how public BIN databases code it. App.652-653. ActBlue also initiated an Address Verification Service (AVS) check for the card, which compared the numeric portions of the billing address Robinson entered on ActBlue with the numeric address the issuing bank had on file for the cardholder. App.653. The check indicated that the two addresses matched. *Id*. Given that, and because the card did not code as a prohibited card, ActBlue accepted Robinson's contributions. *Id*.

Paxton's investigation then lay dormant for another two months. During this period, the *New York Times* published an article alleging that ActBlue's outside counsel warned ActBlue in 2025 that it may have "given a potentially misleading response" to Congress in a 2023 letter. App.242. According to the article, the letter concerned ActBlue's use of passport information to screen out unlawful donations by foreign nationals. App.245-246.[1]

Two weeks after the *Times* article was published, Talarico, who by then had secured the Democratic nomination, released his fundraising numbers for the first quarter of 2026. App.235-237. He announced contributions of $27 million,

[1] ActBlue disputes that it inaccurately described its donor-vetting process and has debunked that allegation in a whitepaper. ActBlue, *ActBlue's November 2023 Letter to Congress Accurately Described Its Robust Vetting of Contributions by Americans Overseas* (Sept. 12, 2026).

reportedly the most ever for a Senate candidate in the first quarter of an election year. App.237.

### D. Paxton's Texas Lawsuit

Five days after Talarico announced his fundraising results, Paxton sued ActBlue in Texas state court. App.253-280. His petition alleges violations of the DTPA, which prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code §17.46(a). According to the petition, ActBlue informed Congress that it would no longer accept donations from "gift cards and foreign prepaid debit cards," when that was (according to Paxton) not true. App.253. Consequently, the petition says, that representation and ActBlue's related representations, such as that "[e]very contribution made through ActBlue is reviewed" against "rigorous standards of compliance," are false and deceptive. App.271-272. To support those allegations, the petition points to the donations Paxton's investigators made, as well as the *New York Times* article discussed above. App.264-266, 268. The lawsuit seeks civil penalties and injunctive relief barring ActBlue from allowing contributions made with gift cards and prepaid debit cards. App.280.

Paxton announced his lawsuit in a press release describing ActBlue as an organization that "funds primarily left-wing campaigns" and assists the "radical left." App.285. He also trumpeted the case in fundraising emails for his Senate

campaign. App.628, 630, 632. In one email with the subject line "Lawless Democrats Under Investigation," he described ActBlue as "the Democrats' shadowy digital fundraising network," "based out of far-left Cambridge Massachusetts." App.628. (ActBlue is not based out of Cambridge.) Asserting that "Democrats have become lawless and dangerous," the email urged donors to support Paxton to "prevent Democrats from destroying this country." *Id.* A later email noted that "James Talarico has been using the far-left's ActBlue network to raise eye-popping sums online." App.634.

Paxton also discussed the case on conservative podcasts. For example, on one podcast, he remarked that ActBlue donations "are largely going to liberal Democrats." App.75-76. On a second, he stated that "ActBlue has raised billions of dollars for liberal causes, liberal Democrats." App.76. And when asked on a third whether the suit would allow him to "collect information that applies to the whole country," Paxton responded: "I love that question because I'm running for U.S. Senate. When [I'm] in the U.S. Senate, I'll be all over this." App.75.

After ActBlue filed this lawsuit, answered Paxton's Texas petition, and filed a special appearance challenging the Texas court's jurisdiction, Paxton amended his Texas complaint. App.2, 406. In that complaint, he alleged for the first time that ActBlue's alleged misrepresentations concerning its use of passport

information and certain other policies for screening out foreign donations violated the DTPA. App.476-484.

### E. This Action

Shortly after Paxton filed his initial Texas petition, ActBlue brought this suit, alleging that Paxton's investigative demands and the Texas lawsuit were in retaliation for ActBlue's protected political activity as well as that of its users. App.38-43. ActBlue moved for a preliminary injunction barring Paxton from pursuing the Texas lawsuit and any further retaliatory investigative activities. App.46-47. Paxton moved to dismiss. App.379-404. Following a hearing, App.678-741, the district court granted a preliminary injunction and denied dismissal, App.675.

The court first addressed Paxton's threshold objections. It found "no merit" to Paxton's contention that the court lacked personal jurisdiction over him, noting that he had initiated sufficient contacts with Massachusetts—such as "serv[ing] RTEs and CIDs on ActBlue in Massachusetts"—that were "related to" ActBlue's claims. App.666. The court rejected Paxton's challenge to venue for the same reasons. App.666 n.5.[2]

---

[2] The court also found that Paxton "conducted his review of responsive documents at ActBlue's Massachusetts headquarters." App.666. That specific fact, which ActBlue's complaint does not allege, is not necessary for personal jurisdiction or venue here. *See infra* pp.43-50.

The court next held that it was not required to abstain from exercising jurisdiction under *Younger*. App.667. It explained that "*Younger* does not apply … when a state proceeding is brought in bad faith, that is, for the purpose of harassment." *Id*. (quotation marks omitted). And it found "the evidence of bad faith … sufficiently overwhelming" to preclude abstention. *Id*. The court pointed out that the investigation "sat dormant … until the day after Talarico announced his fundraising results" and that, even after his investigators made donations on ActBlue, "Paxton waited another two months" to sue, "until Talarico filed his fundraising numbers with the FEC." App.667-668. The court further reasoned that "the theory of harm" in the Texas lawsuit "rings hollow," particularly given "Paxton's well-known history of filing retaliatory lawsuits" and "his failure to take any action on similar complaints filed against ActBlue's conservative analog, WinRed." App.668-669. Finally, the court found that "Paxton's public statements in the wake of filing the case … reveal his true motivation": "retaliation for (and … an attempt to suppress) ActBlue's efforts to fund Talarico's campaign." App.670-671.

The court then concluded that all four preliminary-injunction factors favored relief. It held that ActBlue was likely to succeed on the merits of its First Amendment retaliation claims for "much the same reasons" that abstention was inappropriate: ActBlue had "engaged in protected conduct" by "facilitating the

donation of funds to political candidates," and the Texas lawsuit is "an adverse action" taken "in retaliation" for that conduct. App.673. As for the other factors, the court noted that "the suppression of speech alone constitutes irreparable harm" and recognized "an inherent public interest in ensuring that state officials respect the explicit guardrails set out in the U.S. Constitution, particularly when it comes to matters of political speech." App.674-675.

The court thus enjoined Paxton "from continuing to litigate" the Texas action and "from bringing any new state civil enforcement action premised on the same conduct." App.675. And it denied Paxton's motion to dismiss for the same reasons. App.662 n.1.

## SUMMARY OF ARGUMENT

ActBlue brought this lawsuit to stop Paxton's attacks on its political activity, including via the recent Texas enforcement action. Relying on an extensive record of Paxton's retaliatory intent, the district court exercised jurisdiction and granted a preliminary injunction. It did not abuse its discretion in doing so, and this Court should affirm.

I. No threshold issue precluded the district court from granting a preliminary injunction.

A. *Younger* abstention is unwarranted. *Younger* generally requires federal courts to "abstain from entertaining a suit that seeks to enjoin a state

criminal prosecution" or analogous civil proceeding. *Sirva Relocation, LLC v. Richie*, 794 F.3d 185, 191, 192 (1st Cir. 2015). But when the "state proceeding is motivated by a desire to harass or is conducted in bad faith," *Younger* does not apply. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 611 (1975).

Overwhelming evidence supports the district court's factual finding that Paxton brought the Texas lawsuit in bad faith, to retaliate against ActBlue's political activity. The suit's central allegation—that ActBlue falsely represented that it has a policy of rejecting gift-card donations—is baseless, as Paxton's own investigation demonstrated: His investigators attempted three donations using a prohibited card, and ActBlue *rejected* each (something Paxton declined to mention in his Texas petition). The three successful donations Paxton highlights used cards that neither ActBlue's anti-fraud software nor public databases identify as gift cards or other prohibited cards. At most, those transactions show that ActBlue did not perfectly execute its policy, not that it misrepresented it. The timing of Paxton's actions is also telling: Paxton revived his dormant investigation the day after Talarico reported raising significant funds, mostly through ActBlue, and Paxton sued shortly after another such announcement. Worse still, when Paxton announced his Texas lawsuit, he emphasized ActBlue's work with "left-wing campaigns" and "liberal Democrats," even though ActBlue's partisan affiliation is irrelevant to whether it violated the DTPA. App.76, 285. Finally, Paxton's actions

here mirror his conduct in prior enforcement matters that courts have deemed retaliatory. *See Media Matters*, 138 F.4th at 585; *Jolt*, 821 F.Supp.3d at 724. Those prior actions are properly considered here to demonstrate "intent." Fed. R. Evid. 404(b)(2).

Paxton's contrary arguments lack merit. He contends (Br.18) that "*Younger*'s bad-faith exception applies only to repeated failed proceedings." *Younger* says otherwise, explaining that abstention is unwarranted when a suit is "brought in bad faith *or* is only one of a series of repeated prosecutions." 401 U.S. at 49 (emphasis added). Paxton next argues (Br.22) that abstention is required unless a state-court proceeding is "without hope" of success. But while bad-faith suits will often be meritless, a retaliatory proceeding "will justify an injunction *regardless* of whether valid convictions conceivably could be obtained." *Lewellen v. Raff*, 843 F.2d 1103, 1112 (8th Cir. 1988). In any event, the record and the district court's factual findings (which Paxton has not shown to be clearly erroneous) demonstrate that Paxton's Texas lawsuit has no hope of success.

B. Personal jurisdiction exists here over Paxton. A court's exercise of jurisdiction over a defendant comports with due process if the suit "relate[s]" to the defendant's "purposeful" forum contacts and "the exercise of jurisdiction is reasonable." *A Corp. v. All American Plumbing*, 812 F.3d 54, 59 (1st Cir. 2016) (alteration in original). That standard is met (or at a minimum likely met) here

because Paxton sent document demands to ActBlue in Massachusetts, which required ActBlue to take action in Massachusetts and inflicted constitutional injury there. Paxton's investigators also used ActBlue's Massachusetts-based platform (pursuant to terms that included a Massachusetts forum-selection clause) to make test donations, including a donation directly to ActBlue, a Massachusetts entity. And the Texas lawsuit, which Paxton filed to further injure ActBlue in Massachusetts, arose out of this investigation. That course of conduct amply satisfies the constitutional minimum.

C. Venue is proper in the District of Massachusetts for similar reasons. Because the locus of ActBlue's political activity, Paxton's investigation, and ActBlue's injury is Massachusetts, "a substantial part of the events or omissions giving rise to the claim occurred" there, 28 U.S.C. §1391(b)(2).

II. ActBlue is likely to succeed on the merits of its retaliation claims. Paxton does not contest that ActBlue "engaged in constitutionally protected conduct," or that his investigative demands and the Texas lawsuit constitute "adverse action[s]." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012). And the same evidence establishing Paxton's bad faith for *Younger* purposes demonstrates that retaliation caused Paxton's actions.

Unable to demonstrate any error in the district court's findings, Paxton asks this Court to jettison its settled causation test and require ActBlue to plead and

prove that he lacked probable cause to bring the Texas lawsuit. But Paxton failed to make that argument to the district court, so he has forfeited it. In any event, the absence-of-probable-cause rule applies only in retaliation cases involving criminal prosecutions and arrests, and its justifications are limited to those contexts. *See Hartman v. Moore*, 547 U.S. 250, 259-263 (2006); *Nieves v. Bartlett*, 587 U.S. 391, 401-402 (2019). Finally, ActBlue would prevail even under Paxton's test, because Paxton had no reasonable basis to bring the Texas action.

III. The other preliminary-injunction factors favor relief. The First Amendment injuries Paxton's conduct inflicts on ActBlue are *per se* irreparable. And Paxton has no legitimate interest in weaponizing his law-enforcement powers for retaliatory ends.

## STANDARD OF REVIEW

The grant of a preliminary injunction is reviewed for abuse of discretion. *Corporate Technologies, Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013). Within the abuse-of-discretion framework, this Court reviews legal conclusions *de novo* and factual findings for clear error. *Id.* Whether a state official initiated an enforcement action in bad faith is a factual issue reviewed for clear error. *See Cullen v. Fliegner*, 18 F.3d 96, 104 (2d Cir. 1994); *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1091-1092 (5th Cir. 2023). This Court may "affirm a district court's

decision on any ground supported by the record." *United States v. Zorrilla-Echevarria*, 723 F.3d 298, 300 (1st Cir. 2013).

**ARGUMENT**

The preliminary-injunction analysis weighs the movant's likelihood of success on its claims, whether the movant will suffer irreparable harm absent relief, the balance of hardships, and the public interest. *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009). "The first two factors are the most important," *id.*, and the last two factors "merge" "when the [g]overnment is the opposing party," *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (alteration in original). Jurisdiction and other threshold issues are analyzed as part of the preliminary-injunction inquiry. That is because "a court does not make a final decision on any matter necessary to the ultimate judgment" at the preliminary-injunction stage, and both jurisdiction and the merits "bear on the claim's ultimate prospects." *Mullin v. Doe*, 146 S.Ct. 2121, 2137 (2026) (plurality). Thus, a party seeking a preliminary injunction "need only make a clear showing that [it is] *likely* to succeed in establishing" jurisdiction and satisfying other threshold requirements. *Doe v. Trump*, 157 F.4th 36, 47 (1st Cir. 2025); *accord Murthy v. Missouri*, 603 U.S. 43, 58 (2024). Every preliminary-injunction factor favors relief here, and the district court did not abuse its discretion in so finding.

## I. PAXTON'S THRESHOLD ARGUMENTS FAIL

The district court correctly rejected Paxton's threshold arguments. Paxton's retaliatory Texas lawsuit is a paradigmatic bad-faith proceeding to which *Younger* does not apply. And his repeated reaching into Massachusetts to injure ActBlue readily supports both personal jurisdiction and venue. At the very least, ActBlue is likely to prevail on these issues.

### A. *Younger*

1. Federal courts have a "virtually unflagging" obligation to "hear and decide" cases within their jurisdiction. *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013). And "[p]arallel state-court proceedings do not detract from that obligation." *Id.* Indeed, "only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989).

*Younger* is a narrow exception to that rule. Under *Younger*, federal courts must "abstain from entertaining a suit that seeks to enjoin a state criminal prosecution" or analogous civil proceeding, "so long as the state proceeding affords an adequate opportunity to raise … federal defense[s] and abstention will not cause irreparable harm." *Sirva*, 794 F.3d at 191-192. The doctrine is grounded in principles of equity and "the notion of 'comity,' that is, a proper respect for state functions." *Younger*, 401 U.S. at 44.

But *Younger* is itself subject to exceptions, one of which is controlling here. As the Supreme Court and this Court have recognized, abstention is not appropriate when a "state proceeding is motivated by a desire to harass or is conducted in bad faith." *Huffman*, 420 U.S. at 611; *accord Sirva*, 794 F.3d at 192. That exception follows from *Younger*'s logic: Because a "state has no legitimate interest" in a bad-faith proceeding, *Younger*'s "comity" rationale "gives way." *Netflix*, 88 F.4th at 1085. And a bad-faith proceeding—particularly one "brought to retaliate for or to deter the exercise of constitutionally protected rights"—"as a matter of law cause[s] irreparable injury," justifying equitable relief. *Wilson v. Thompson*, 593 F.2d 1375, 1383 (5th Cir. 1979); *accord Collins v. Kendall County*, 807 F.2d 95, 98 (7th Cir. 1986). Indeed, First Amendment retaliation is a well-recognized form of bad faith and basis for bypassing *Younger*. *See, e.g.*, *Cullen*, 18 F.3d at 103-104; *Timmerman v. Brown*, 528 F.2d 811, 815 (4th Cir. 1975); *Netflix*, 88 F.4th at 1085, 1091; *Wilson*, 593 F.2d at 1383; *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 87-88 (5th Cir. 1992); *Lewellen*, 843 F.2d at 1110-1111; *Krahm v. Graham*, 461 F.2d 703, 707-708 (9th Cir. 1972); *Jolt*, 821 F.Supp.3d at 719-720.

No single criterion determines whether a state official instituted a proceeding in bad faith; rather, courts consider the totality of the circumstances. For example, in *Netflix, Inc. v. Babin*, the Fifth Circuit upheld the enjoining of a

prosecution retaliating against Netflix for streaming a controversial film. 88 F.4th at 1085. The court identified bad faith in the prosecution's "timeline," noting that the prosecutor took escalatory steps in conjunction with Netflix's assertion of "its First Amendment rights," as well as the prosecutor's dubious theory of wrongdoing and "inconsisten[t]" explanations for his actions. *Id.* at 1092-1094. Similarly in *Cullen v. Fliegner*, the Second Circuit deemed *Younger* inapplicable where a school district instituted disciplinary proceedings against a teacher to retaliate for his protest activity. 18 F.3d at 104. According to the court, bad faith could be inferred from the district's "past history of personal conflict" with the teacher that "rose to the level of animus," in addition to its pursuit of the challenged enforcement action "in a strictly *ad hominem* manner." *Id.* And in *Jolt*, the court found that Paxton had acted in bad faith based on the lack of "any credible evidence" of wrongdoing and the "multiplicity of enforcement tools" he deployed, "escalating" from an investigation to a lawsuit "even without finding any new evidence to suggest wrongdoing." 821 F.Supp.3d at 719, 720.

2. Overwhelming evidence demonstrates that Paxton brought his Texas lawsuit in bad faith to retaliate against ActBlue for its political activity and that of its users. For starters, the Texas lawsuit is predicated on the false allegation that ActBlue misrepresented its policies regarding gift-card donations. Since late 2024, ActBlue's policy has been to refuse donations made with gift cards and certain

prepaid cards that pose an elevated risk of fraud. App.651-652. And that is what ActBlue told Congress. As the press release Paxton relies on states, "ActBlue has implemented updated policies to automatically reject donations that use foreign prepaid/gift cards, domestic gift cards, are from high-risk/sanctioned countries, and have the highest level of risk as determined by [ActBlue's] solution provider, Sift." *Chairman Steil Releases Finding from Subpoena of ActBlue*, United States Committee on House Administration (Dec. 10, 2024) (quotation marks omitted) (quoted at App.263-264). That representation was true when made and remains true today. Paxton's investigation proved as much: Three times his investigators tried to make donations using an anonymous prepaid card (functionally identical to a gift card), and each time ActBlue automatically *rejected* them. App.375, 650. And Paxton's claims regarding the other statements he challenges—such as ActBlue's assertion that "[e]very contribution made through ActBlue is reviewed" against "rigorous standards of compliance"—are derivative of his contention that ActBlue accepts gift cards. App.272.

The three successful donations Paxton highlights (Br.7, 21) do not suggest that ActBlue made false representations. To begin with, it is not clear that those donations were made with gift cards rather than a form of prepaid card ActBlue's policy does not cover. Although Paxton's investigators say they used gift cards, App.542, 547, their terminology may be imprecise, given that neither public BIN

databases nor ActBlue's fraud-detection software identify the cards as such, App.652-653. And even assuming the donations were made with gift cards, ActBlue stated that its policy is to reject gift-card donations, not that it can enforce that policy 100 percent of the time. So the fact that Paxton's investigators allegedly managed to get three gift-card donations through (after several failed attempts) does not suggest misrepresentation—just as the fact that some violations of law in Texas go unpunished does not suggest Paxton is lying when he says he is focused on "protecting Texans" and "upholding Texas laws." *About the Attorney General*, Tex. Att'y Gen. (Sept. 21, 2026). Moreover, the record makes clear that ActBlue was attempting to enforce its policy in good faith: It rejected several of Paxton's investigator's attempts to use a prohibited prepaid card, and accepted the donations from certain other cards only because the cards' issuer-supplied BIN data did not identify them as prohibited cards on ActBlue's system. Paxton's decision to forge ahead despite these defects in his theory forecloses any clear-error challenge to the district court's factual finding of bad faith.

Paxton's opening brief underscores his lack of interest in the facts. Relying on a footnote in the district court's opinion, Paxton claims ActBlue no longer denies that it "misrepresent[ed] … its services," Br.1, and that the district court supposedly "found" that ActBlue accepts gift cards "sourced through a major credit card provider," Br.24. In reality, the footnote states in relevant part:

"ActBlue alleges that these attempts were only successful because the gift cards had been sourced through a major credit card provider and its processing vendor consequently failed to identify them as gift cards. The court expresses no opinion on the accuracy of this assertion[.]" App.668 n.6. To state the obvious, an explanation of why the donations went through is not a concession that anything was misrepresented—and a footnote that "expresses no opinion" makes no factual findings. Furthermore, the footnote is imprecise: ActBlue has never represented that its vendor generally accepts gift cards sourced through major credit-card providers. It simply explained that, in this instance, its vendor did not identify certain cards Paxton's investigators used as gift cards, and those cards happened to be issued by major credit-card providers. App.652-653.

Even more egregious is Paxton's assertion that the district court "found" that ActBlue "falsely represented to Congress and the public that it updated its policies and no longer accepted gift card donations." Br.20 (quotation marks omitted). For that claim, Paxton cites the same footnote, as well as a page of the district court's opinion (App.663) that says nothing of the sort. The latter describes ActBlue's representation to Congress about its policies in a paragraph that concludes not with a finding of fact, but with the following statement: "The parties dispute the accuracy of this representation." App.663.

The foregoing evidence of bad faith is just the tip of the iceberg. As the district court observed, "the timing of events alone speaks volumes about Paxton's underlying motivation." App.667. After Paxton sent his rulemaking petition to the FEC in 2024, his inquiry went dark for 16 months. App.204, 547. He revived it only after (one day after) Talarico, his then-probable opponent for Senate, announced that he had raised significant funds (largely through ActBlue). App.27-28, 547, 663-664. That "inflection point" is "difficult to overlook," *Netflix*, 88 F.4th at 1092, particularly because ActBlue's representations to Congress about its gift-card policies had been public for well over a year, App.263. Then, after his investigators attempted test transactions, Paxton took no further action for nearly two months, filing the Texas lawsuit only after Talarico announced another fundraising milestone—also achieved with ActBlue's assistance. App.25, 233, 253. These "burst[s] of prosecutorial alacrity" each time ActBlue helped Talarico achieve fundraising milestones are strong evidence that Paxton targeted ActBlue because of its assistance, not because of good-faith concerns about fraud. *Netflix*, 88 F.4th at 1092. And after ActBlue brought this case, Paxton "upp[ed] the ante" yet again, *id.* at 1093, adding allegations that ActBlue's statements to Congress about its foreign-contribution policies violated the DTPA, App.478-484.

Paxton's "public statements" further confirm his retaliatory intent. App.670. He has long been hostile to ActBlue and its support for Democrats and other

progressives, describing ActBlue as a means by which "[t]he radical left … subvert[s] our laws and compromise[s] the integrity of our elections," App.285, and a "shadowy digital fundraising network" that puts "apparently zero safeguards in place to prevent foreign money from influencing elected Democrats and their campaigns," App.628. He also repeatedly and baselessly accused ActBlue of facilitating criminal activity. *E.g.*, App.204-205, 285-286, 628, 630, 632. Taken together, these "*ad hominem*" attacks easily rise "to the level of animus." *Cullen*, 18 F.3d at 104.

Even worse, Paxton has framed his Texas lawsuit in partisan terms. His press release announcing the suit stated that "ActBlue funds primarily left-wing campaigns" and assists the "radical left." App.285. And on talk shows he repeatedly emphasized that ActBlue raises money for "liberal Democrats" and tied his actions against ActBlue to his Senate campaign. App.75-76. The political affiliation of the candidates and causes ActBlue serves is, or should be, irrelevant to a DTPA case brought in good faith. That Paxton nevertheless found it important to highlight that affiliation confirms that his purpose is not good-faith law enforcement, but punishing ActBlue for aiding Democrats and other progressives.

Paxton's Texas lawsuit is also the culmination of a campaign with a clear objective—harming ActBlue—but no legitimate justification. Paxton began the investigation supposedly "to determine whether ActBlue's operations are

compliant with all applicable laws." App.201. For a time, he focused on ActBlue's use of credit-card CVV codes, App.201, 364, but then shifted to ActBlue's other compliance practices, petitioning the FEC for rules governing "contributions made by credit, debit, prepaid, or gift card," App.302. When Paxton exhumed the investigation 16 months later, his new target was ActBlue's statements to Congress. App.271-276. And even within the Texas lawsuit itself, Paxton cannot keep his story straight: Every count in the initial complaint concerns ActBlue's representations about gift-card and prepaid debit-card donations, yet much of the body of the complaint rests on reporting about ActBlue's use of passports to screen out foreign contributions. App.242-251, 264-266, 271-276. Such shifting rationales are classic evidence of pretextual, bad-faith action. *See Netflix*, 88 F.4th at 1095-1096; *United States v. Bowles*, 751 F.3d 35, 38 (1st Cir. 2014); *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 431-432 (1st Cir. 2000).

The "larger legal context" is also instructive. *Netflix*, 88 F.4th at 1094; *see also* Fed. R. Evid. 404(b)(2). On the one hand, there is Paxton's adjudicated history of retaliating against organizations he opposes politically in ways that mirror his actions against ActBlue. *Supra* pp.6-9; App.668-669. As here, he investigated Media Matters, Jolt, and Powered by People; criticized their political activities and viewpoints; subjected them to onerous demands for documents; and,

in the latter two cases, sued them. App.110; App.195-196; *Media Matters*, 732 F.Supp.3d at 8; *Jolt*, 821 F.Supp.3d at 713-714; *Texas v. O'Rourke*, No. 348-367652-25 (348th Dist. Ct., Tarrant Cnty., Tex.); *supra* pp.6-9. Paxton's actions against Media Matters and Jolt were deemed retaliatory, and his suit against Powered by People appears headed towards a similar end. *Media Matters*, 138 F.4th at 585; *Jolt*, 821 F.Supp.3d at 714, 718-720; *In re Powered By People & Robert Francis O'Rourke*, 2025 WL 5094568, at *6, *7. On the other hand, there is Paxton's "failure to take any action" regarding WinRed, "ActBlue's conservative analog." App.669. Despite public criticism of WinRed's fundraising tactics, Paxton has shown no investigative interest and still uses WinRed to raise money for his campaign. App.207-215, 217-220, 222-224, 231. WinRed itself has a policy of declining gift-card donations similar to ActBlue's, yet Paxton has apparently never put WinRed's claim to the test. *Having Trouble Donating?*, WinRed Help Ctr. (Sept. 21, 2026); *see* App.689. Paxton's disparate treatment of politically favored and disfavored organizations is yet more reason to "question the evenhandedness of his prosecutorial tactics," *Netflix*, 88 F.4th at 1093.

Capping it off is Paxton's use of privileged material in both the Texas litigation and here. The memos cited in the *New York Times* article discussed earlier are subject to attorney-client privilege. App.586. ActBlue has never waived the privilege, nor did the publication of material from the memos vitiate it.

*See Smith v. Armour Pharmaceutical Co.*, 838 F.Supp. 1573, 1577 (S.D. Fla. 1993); *Dukes v. Wal-Mart Stores, Inc.*, 2013 WL 1282892, at *4-*5 (N.D. Cal. Mar. 26, 2013). As a result, Paxton's knowing use of the memos in litigation is improper. *See Gomez v. Vernon*, 255 F.3d 1118, 1134 (9th Cir. 2001). Yet when ActBlue demanded that Paxton remove allegations from the Texas lawsuit based on privileged material, he refused. App.586. And he continues to rely on the material here, App.560, 586, including in his opening brief (p.8), even though the district court recognized that ActBlue "seemingly had not waived the privilege" as to the memos, App.664 n.3. Again, that is not the conduct of someone acting in good faith.

In sum, the district court was manifestly correct: "[T]he evidence of bad faith is sufficiently overwhelming to qualify this as one of the rare cases where [*Younger*'s bad-faith exception] should apply." App.667. At a minimum, the court did not clearly err in so finding.

3. Paxton fails to engage with most of this evidence, and his legal arguments for abstention lack merit.

a. Paxton asserts (Br.18) that "*Younger*'s bad-faith exception applies only to repeated failed proceedings." That is incorrect. *Younger* itself recognized that repeated proceedings are not a *sine qua non* of bad faith, stating that abstention was appropriate partly because there was "no suggestion" that the state proceeding

was "brought in bad faith *or* is only one of a series of repeated prosecutions." 401 U.S. at 49 (emphasis added). No subsequent Supreme Court decision has said otherwise, and multiple courts of appeals have rejected Paxton's argument. The Fifth Circuit, for example, has held that "the bad faith exception is not limited to situations where there is a threat of … repeated prosecutions." *Wilson*, 593 F.2d at 1381; *accord Fitzgerald v. Peek*, 636 F.2d 943, 944 (5th Cir. 1981). And both the Eighth and Eleventh Circuits have applied the exception where there was only one proceeding. *See Lewellen*, 843 F.2d at 1108, 1112-1113; *Rowe v. Griffin*, 676 F.2d 524, 526 (11th Cir. 1982). Paxton's rule would also give state officials one free retaliatory proceeding per defendant, no matter how egregious the official's conduct. Nothing in *Younger* or other cases requires that perverse result.

Unsurprisingly, Paxton identifies no case endorsing his multiple-failed-prosecutions rule. He invokes *Younger* for the proposition that "the cost, anxiety, and inconvenience of having to defend against a single … prosecution" does not amount to irreparable harm. 401 U.S. at 46. But the opinion is clear that this statement applies only to proceedings "brought lawfully and in good faith." *Id.* at 47; *accord id.* at 48. He also selectively quotes (Br.19) a footnote in an unpublished Sixth Circuit decision, *Ken-N.K., Inc. v. Vernon Township*, 18 F.App'x 319 (6th Cir. 2001), which, accurately quoted, merely observes that "the Supreme Court has applied the 'bad faith' exception to only one specific set of

facts," where there were "repeated prosecutions." *Id.* at 324 n.2. And he wrongly claims (Br.19-20) that courts, including this Court, have limited the exception to the circumstances of that Supreme Court case, *Dombrowski v. Pfister*, 380 U.S. 479 (1965). The only case from this Court he mentions, *United Books, Inc. v. Conte*, 739 F.2d 30 (1st Cir. 1984), found the bad-faith exception inapplicable based on "six prosecutions over a two year period *that resulted in convictions all but once*," *id.* at 34 (emphasis added). Needless to say, declining to find bad faith based on repeated *successful* prosecutions does not establish that bad faith exists only after repeated *unsuccessful* prosecutions.

Finally, Paxton invokes (Br.12, 19, 21-22) *American Academy of Pediatrics v. Uthmeier*, 178 F.4th 1113, 1130 (7th Cir. 2026), *reh'g en banc granted*, 180 F.4th 1022, *appeal dismissed*, 2026 WL 2686175 (mem.) (7th Cir. Sept. 14, 2026). That case resulted in an unreasoned vacatur of a panel decision and stay of injunction followed by a summary dismissal of the appeal for lack of appellate jurisdiction—in other words, no persuasive authority. Moreover, the evidence of bad faith is far stronger here: Paxton's Texas suit is more obviously meritless than its counterpart in *American Academy of Pediatrics*, because Paxton's core allegation is more demonstrably false. In addition, the timing here is far more suspicious; Paxton's retaliatory conduct is more extensive; and his adjudicated history of retaliation has no analog there.

b. Paxton contends that the bad-faith exception "requires that the state-court proceeding be brought *without hope* of obtaining a valid conviction," a standard he says ActBlue cannot meet. Br.22 (quotation marks omitted). But while bad-faith proceedings will often have dim odds of success, there is no "without hope" requirement. The decision from which Paxton draws that supposed requirement, *Perez v. Ledesma*, 401 U.S. 82 (1971), says that abstention is inappropriate "in cases of proven harassment *or* prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction *and* perhaps in other extraordinary circumstances where irreparable injury can be shown," *id.* at 85 (emphasis added). *Perez* thus recognizes that an improper proceeding need *not* be "without hope" of success to be enjoined. And numerous subsequent *Younger* decisions never mention any "without hope" inquiry, as they surely would if it were a prerequisite to the bad-faith exception. One case, for example, said a state proceeding may be enjoined if it is "motivated by a desire to harass or is conducted in bad faith." *Huffman*, 420 U.S. at 611; *accord Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 435 (1982); *Sprint*, 571 U.S. at 77.

Furthermore, a proceeding instituted to retaliate for the exercise of constitutional rights "will justify an injunction *regardless* of whether valid convictions conceivably could be obtained." *Lewellen*, 843 F.2d at 1112; *accord*

*Fitzgerald*, 636 F.2d at 945. Because a state "cannot have a legitimate interest in discouraging the exercise of constitutional rights," the "expectations for success" of a retaliatory proceeding "need not be relevant" to the *Younger* inquiry. *Cullen*, 18 F.3d at 104. Even Paxton's *amici* quote caselaw stating that bad faith exists if "state officials [are] using or threatening to use prosecutions, *regardless of their outcome*, as instrumentalities for the suppression of speech." Indiana Br.6 (emphasis added).

In any event, Paxton's Texas lawsuit has no prospect of success. The DTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code §17.46(a). And as explained, no reasonable adjudicator could conclude that ActBlue committed the false or misleading act Paxton alleges (misrepresenting its gift-card donation policies). *See supra* pp.26-28. Even an "ignorant, unthinking, or credulous person" would not mistake ActBlue's statement of its policy to reject gift card donations as a representation that its screening mechanisms are perfect. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 479-480 (Tex. 1995). That is presumably why Paxton has failed to identify anyone who claims to have been misled by ActBlue's representations about its gift card policies.

Although Paxton criticizes the district court's analysis of the merits of his Texas lawsuit, he identifies no actual error. He claims (Br.24-25) that the court did

not properly address whether the Texas suit was meritless. As explained, such an analysis was not required. *See supra* pp.37-38. In any event, the court called Paxton's theory "hollow" and not "compelling" and quoted a passage in *Jolt* "finding bad faith where, despite being 'given multiple chances,' Paxton could not identify any convincing evidence demonstrating that he had 'a hope of succeeding'" in his suit. App.668 (quoting 821 F.Supp.3d at 719). Besides an incantation of the words "without hope," it is not clear what more Paxton wants.

Paxton also takes issue (Br.26-27) with the district court's conclusion that ActBlue's speech falls outside the DTPA because it is not "commercial." App.669. But the commercial-speech question is a distraction: It arose after Paxton claimed that he was not retaliating against ActBlue for protected speech because his Texas action concerned ActBlue's representations about its gift-card policies, which he labels misleading commercial speech. App.568-569. ActBlue has never argued, however, that Paxton is retaliating against it for its speech about gift cards; rather, Paxton is retaliating for ActBlue's political activity supporting Democrats and other progressives. App.6-8, 38-40. So any debate about the commercial nature of ActBlue's statements to Congress is beside the point.

Regardless, those statements are not commercial speech. The speech does not merely "propose a commercial transaction," the core test for commercial speech. *Harris v. Quinn*, 573 U.S. 616, 648 (2014). Nor does it "relate[] solely" to

ActBlue's "economic interests" and those of the speech's "audience"—Congress. *El Dia, Inc. v. Puerto Rico Department of Consumer Affairs*, 413 F.3d 110, 115 (1st Cir. 2005). And even if ActBlue's representations had a commercial component, such speech is "inextricably intertwined" with ActBlue's "otherwise fully protected" speech, so it too receives full First Amendment protection. *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796 (1988).

c. Paxton next contends (Br.27) that ActBlue has not "establish[ed] the irreparable injury necessary to establish *Younger*'s bad-faith exception." Again, his own authorities refute his argument. He notes that for a *Younger* exception to apply, the federal-court plaintiff (and state-court defendant) must demonstrate an irreparable injury "'other than that incidental to every … proceeding brought lawfully and in good faith.'" Br.27 (quoting *Younger*, 401 U.S. at 47). Here, however, Paxton seeks to subject ActBlue to a proceeding brought unlawfully and in bad faith. And "a showing of retaliatory or bad faith prosecution establishes irreparable injury for the purposes of the *Younger* doctrine." *Cullen*, 18 F.3d at 104; *accord Netflix*, 88 F.4th at 1099-1100. As the Supreme Court has explained, when "a substantial loss or impairment of freedoms of expression will occur" if a party "must await the state court's disposition," that constitutes an "irreparable injury." *Dombrowski*, 380 U.S. at 486.

d. Finally, Paxton submits (Br.28-33) that the district court's factual findings about Paxton's subjective bad faith are both "irrelevant" and clearly erroneous. The first point is contrary to Supreme Court precedent, which holds that abstention is inappropriate if a "state proceeding is *motivated by* a desire to harass or is conducted in bad faith." *Huffman*, 420 U.S. at 611 (emphasis added). Retaliation, for example, is a quintessential form of bad faith, *see supra* p.25, and determining whether an official acted to retaliate requires a subjective inquiry.

As for the latter argument, Paxton does not come close to establishing clear error. He begins by attacking the district court's inference of bad faith from Paxton's failure to pursue WinRed, contending (Br.28) that the reported issues with WinRed differ from his allegations about ActBlue. But that misses the point: If Paxton's concerns with deceptive political fundraising were genuine, he would have *some* interest in WinRed's conduct, including its representations about its gift-card policies, which resemble ActBlue's. *See supra* p.33.

Next, Paxton claims (Br.28) that the district court improperly "dismissed [his] reliance on the New York Times article" because he had not fact-checked the article. In truth, the court declined to rely on the article due to "ActBlue's invocation of attorney-client privilege"; the fact-check comment was an aside. App.664-665 & n.3, 668 n.7. At any rate, the article does not help Paxton because

the DTPA violations asserted in his initial Texas complaint have nothing to do with the article's content. App.271-276.

Lastly, Paxton maintains (Br.30-33) that the district court erroneously inferred bad faith from Paxton's public statements. There was no error. Unlike in *Yelp Inc. v. Paxton*, 137 F.4th 944 (9th Cir. 2025), Paxton's statements here did not merely "touch on hot-button issues" or involve "the commonplace stridency of prosecutorial press releases." *Id.* at 956. Instead, Paxton criticized ActBlue for its affiliation with Democrats and other progressives, when that affiliation has no bearing on good-faith law enforcement activities. And also unlike in *Yelp*, where Paxton's actions and speech pertained to the permissible goal of "regulat[ing] abortion," persecuting political opponents because of their political views is not a legitimate "enforcement priorit[y]" or "policy direction." *Id*. at 955-956.

Paxton's efforts to recast his statements as benign cannot be taken seriously. He cannot even bring himself to fully quote his statement that ActBlue's funds "*are largely going to liberal Democrats, and* it's always been a mystery how they raised this much money," App.76, 671 (emphasis added), cutting off the italicized portion in his brief (Br.32). And even if this Court deems the district court's interpretation of Paxton's statements debatable, "when two or more legitimate interpretations of the evidence exist, the factfinder's choice between them cannot

be deemed clearly erroneous." *United States v. Fitzpatrick*, 67 F.4th 497, 503 (1st Cir. 2023).

**B. Personal Jurisdiction**

The district court correctly rejected Paxton's challenge to personal jurisdiction. A Massachusetts federal court has personal jurisdiction over a defendant if "the requirements of both the Massachusetts long-arm statute and the due process clause of the Fourteenth Amendment" are satisfied. *A Corp.*, 812 F.3d at 58. Paxton has never disputed that his conduct meets the requirements of the Massachusetts long-arm statute, and his Massachusetts contacts more than satisfy the requirements of due process.

A court may subject a defendant to its jurisdiction consistent with due process if the defendant has "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotation marks omitted). That test is satisfied when a defendant "has purposefully directed his activities at residents" of a forum state and "the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quotation marks omitted). All three parts of that analysis—"relatedness, purposeful availment, and reasonableness"—are satisfied here. *A Corp.*, 812 F.3d at 59.

1. ActBlue's retaliation claim "arise[s] out of" and "relate[s] to" Paxton's contacts with Massachusetts. *Burger King*, 471 U.S. at 472. The record and the district court's factual findings show that Paxton repeatedly reached into Massachusetts to harass ActBlue for its Massachusetts-based political activity, conduct that easily satisfies the "flexible, relaxed" relatedness standard. *Pritzker v. Yari*, 42 F.3d 53, 61 (1st Cir. 1994). Paxton first sent RTEs into Massachusetts directing ActBlue to make documents available for inspection "at its principal office or place of business"—i.e., in Massachusetts. App.324-325; App.315, 328, 338, 349. Faced with threatened legal sanctions, ActBlue took action in Massachusetts to comply, assembling and making available to Paxton documents stored in Massachusetts. App.26, 377-378. Paxton next served two CIDs on ActBlue, which also requested production in Massachusetts and which ActBlue again complied with by taking actions there. App.359, 366, 378. Paxton's investigators later made donations using ActBlue's Massachusetts-based platform, including one donation directly to ActBlue, a Massachusetts entity. App.322, 375.

Those Massachusetts contacts form a core part of ActBlue's retaliation claims. Per ActBlue's complaint, Paxton took these "investigative measures against ActBlue in retaliation for ActBlue's protected expressive and associational activity." App.38. And they caused ActBlue injury in Massachusetts, violating its First Amendment rights and "forc[ing] [it] to expend time and resources" there.

App.40; *see also* App.7-9, 11-12, 20-27, 38. Applying the tort-law framework this Court has sometimes used to assess relatedness, Paxton's Massachusetts-directed activities were both a "cause in fact" and a "legal cause" of ActBlue's injuries, in that they "gave birth to" ActBlue's "cause of action." *Scottsdale Capital Advisors Corp. v. The Deal, LLC*, 887 F.3d 17, 21 (1st Cir. 2018). Paxton's assertion that "[t]his appeal concerns only a single enforcement action in state court" (Br.20) impermissibly ignores these allegations, as does his assertion (Br.35) that ActBlue has "never even alleged" that the RTEs were retaliatory.

These Massachusetts contacts also relate to ActBlue's challenge to Paxton's Texas lawsuit. Paxton's investigatory measures and the Texas suit are part of a single, escalating course of unconstitutional conduct. Paxton has made that clear: Before the district court, he asserted that the "Texas enforcement action is the culmination of a multi-year investigation by Congress and the Attorney General." App.384-385; *see also* App.558. His appellate brief is of a piece: Objecting to the argument that ActBlue's assistance to Talarico prompted the Texas suit, Paxton asserts (Br.44) that he "began investigating ActBlue in December 2023" and served ActBlue with CIDs in 2024—"long before the current Texas Senate race." *See also* Br.11. That response assumes that the investigation led to the Texas lawsuit. And although Paxton elsewhere suggests that these investigatory steps were unrelated to his Texas action, Br.13, 35, he cannot have it both ways, tying

the Massachusetts investigation to the Texas suit only when it serves him. Nor can he deny that his investigators' donations, which involve Massachusetts contacts, provide the basis for the Texas action.

2. The same conduct constitutes purposeful availment. Such availment exists if the defendant deliberately "reach[ed] out beyond" his home into the forum state, *Walden v. Fiore*, 571 U.S. 277, 285 (2014), but not if his contacts with the forum are "random, isolated, or fortuitous," *Sawtelle v. Farrell*, 70 F.3d 1381, 1390-1391 (1st Cir. 1995). The defendant's contacts with the forum must be voluntary and of such a character that he could "reasonably anticipate being haled into court there." *Burger King*, 471 U.S. at 474. Paxton's contacts make the grade: With every RTE and CID, Paxton deliberately projected his authority into Massachusetts. He served an entity organized and located in Massachusetts with a demand to make available for inspection—in Massachusetts—documents stored in the Commonwealth. And, as found by the district court, he did all of this in retaliation for ActBlue's Massachusetts-based activities. App.673. He then reached into Massachusetts yet again when his investigators donated on ActBlue's platform, which conditioned use on agreement to terms containing a Massachusetts forum-selection clause. App.650. Paxton thus has had every reason to expect that he might have to account for his improper actions in Massachusetts.

Other courts have found personal jurisdiction in closely analogous circumstances. In *Media Matters for America v. Paxton*, the D.C. Circuit upheld the exercise of personal jurisdiction over Paxton in the District of Columbia based on Paxton's service of a single CID there. 138 F.4th at 577. The court emphasized that the District was "the focal point" of Paxton's "allegedly retaliatory investigation and CID" and "of the harm" Media Matters experienced. *Id.* And in *Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020), the Fifth Circuit held that New Jersey Attorney General Gurbir Grewal was subject to personal jurisdiction in Texas based on a single cease-and-desist letter he sent to a Texas company "threatening legal action" if the company did not stop publishing material regarding firearms manufacturing, *id.* at 488-489. The court's conclusion rested on several considerations: (i) Grewal's letter projected authority "across state lines" to impede the company's activities nationwide, "not just in New Jersey"; (ii) the letter "g[ave] rise to intentional tort causes of action"; and (iii) the letter caused "statewide impact" by chilling the company's speech, including to Texans. *Id.* at 492-495.

Personal jurisdiction here follows *a fortiori* from these cases. Both involved a single communication directed at the forum state, whereas this case involves four RTEs sent into Massachusetts, two CIDs compelling conduct in Massachusetts, contributions by Paxton's investigators using ActBlue's Massachusetts platform,

and a lawsuit intended to cause injury in Massachusetts. Each *Defense Distributed* factor is also present: Paxton seeks an injunction that would apply to ActBlue everywhere, not just in Texas; the RTEs and CIDs gave rise to constitutional torts in Massachusetts; and Paxton's actions have the potential to cause "statewide impact" in Massachusetts, by chilling ActBlue's political activity and that of its Massachusetts users.

Relying on *Walden*, Paxton responds that there cannot be purposeful availment because "ActBlue is 'the only link between'" him and Massachusetts. Br.37 (quoting 571 U.S. at 285). ActBlue's decision to reside in Massachusetts, Paxton says, cannot give rise to his "forum contacts." Br.37. These arguments misconceive the inquiry. That a plaintiff's residence in a state provides the only reason for the defendant's contacts with the state is no obstacle to personal jurisdiction so long as "the defendant's conduct … form[s] the necessary connection with the forum State." *Walden*, 571 U.S. at 285. If a person enters a state solely to assault a resident, the assaulter is subject to personal jurisdiction in a tort suit in that state, even though the victim chose to reside there. Similarly, ActBlue chose to reside in Massachusetts, but *Paxton* chose to send coercive demands there, to compel conduct and cause injury there, and to make donations to ActBlue there. By contrast, the *Walden* defendant had no direct contacts with the

forum state (Nevada); all he had done was injure Nevada residents while they were traveling outside Nevada. 571 U.S. at 288-289.

Paxton's invocation (Br.34) of *John Crane, Inc. v. Shein Law Center, Ltd.*, 891 F.3d 692 (7th Cir. 2018), is likewise unavailing. *John Crane* held that a defendant was not subject to personal jurisdiction in Illinois merely because it had sent documents "incidental to" litigations in other states to an Illinois company's local counsel in those states, after which local counsel transmitted the documents to the company in Illinois. *Id.* at 695-696. Here, by contrast, Paxton sent legal process directly to Massachusetts demanding that ActBlue take action there, among other Massachusetts contacts. App.315, 328, 338, 349; *see* App.359, 366. And those contacts were not merely "incidental" to the Texas lawsuit but rather retaliatory acts in their own right.

3. The district court's exercise of jurisdiction was reasonable. Courts assess reasonableness according to the following factors:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution …, and (5) the common interests of all sovereigns in promoting substantive social policies.

*Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 209 (1st Cir. 1994). Defending this suit imposes a minimal burden on Paxton; indeed, he does not claim otherwise. Massachusetts, on the other hand, has a substantial interest in

"being able to provide a convenient forum for its residents to redress injuries inflicted by out-of-forum actors," particularly when those injuries involve the suppression of political activity. *Adelson v. Hananel*, 510 F.3d 43, 51 (1st Cir. 2007). And ActBlue, for its part, has a strong interest in having its constitutional claims resolved in a convenient federal forum—not in the context of a state enforcement action brought in bad faith.

### C. Venue

Venue was proper in the District of Massachusetts for largely the same reasons. Venue lies in a district "in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. §1391(b)(2). A substantial part of the events giving rise to ActBlue's claim occurred in Massachusetts. That is where ActBlue conducts its political activity, Paxton directed the RTEs, ActBlue complied with the RTEs and CIDs, Paxton's test transactions were processed, the test contribution to ActBlue was directed, and ActBlue suffered injury.

Paxton's only response (Br.41) is that ActBlue's suit "is based only on the filing of the Texas lawsuit." Even a cursory review of the complaint belies that assertion. *E.g.*, App.7-9, 11-12, 20-27, 38, 40. The venue inquiry looks "to the entire sequence of events," *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42

(1st Cir. 2001), and the Texas lawsuit is only one of the series of acts ActBlue challenges.

## II. ACTBLUE WILL LIKELY SUCCEED ON THE MERITS

A. The First Amendment prohibits public officials from "us[ing] the power of the State to punish or suppress disfavored expression," *National Rifle Association of America v. Vullo*, 602 U.S. 175, 188 (2024), or "retaliating against individuals for engaging in protected speech," *Lozman*, 585 U.S. at 90. To establish retaliation, a plaintiff must show that it "engaged in constitutionally protected conduct," that it "was subjected to an adverse action by the defendant," and that "the protected conduct was a substantial or motivating factor in the adverse action." *D.B.*, 675 F.3d at 43. The burden then shifts to the defendant, who may avoid liability only by demonstrating that he "would have reached the same decision … even in the absence of the protected conduct." *Id.* (alteration in original).

Paxton has never disputed that he subjected ActBlue to adverse actions, and he no longer contests that ActBlue engaged in protected conduct. That is unsurprising. ActBlue's political fundraising is core First Amendment activity. *See McCutcheon*, 572 U.S. at 191 (plurality). And the legal attacks to which Paxton has subjected ActBlue are plainly adverse actions. Even the "threat of invoking legal sanctions"—to say nothing of an actual enforcement action—deters

speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). And as the D.C. Circuit has explained, "a state attorney general's subpoena power" may "be abused to target viewpoints, chill speech, and silence and intimidate organizations." *Media Matters*, 138 F.4th at 580.

As for causation, the same evidence establishing bad faith under *Younger* demonstrates that Paxton's actions were motivated by a desire to retaliate against ActBlue for its support for Democrats, including Talarico. That evidence includes: Paxton's history of retaliation, his partisan statements, the shifting rationales for his investigation, his investigation's 16-month dormancy broken the day after Talarico's fundraising announcement, his decision to file his Texas lawsuit days after Talarico's quarterly fundraising report, the false allegations underlying that suit, and his double standard regarding WinRed. *Supra* pp.26-34. Given this record and Paxton's failure to submit any meaningful rebuttal evidence, the district court's determination that ActBlue is likely to succeed in showing retaliation was amply justified.

B. Paxton barely challenges this factual showing. He primarily objects to the district court's reliance on the timeline of his actions, contending (Br.44) that because he "began investigating ActBlue in December 2023," there is no basis to tie his Texas lawsuit to "the current Texas Senate race." But even setting aside the inconsistency of this argument with Paxton's assertions that his pre-2026

investigation has nothing to do with his Texas lawsuit, *see supra* pp.45-46, the argument is unpersuasive. That Paxton harassed ActBlue for years in no way demonstrates that his recent escalation is unrelated to ActBlue's political affiliation or assistance to Talarico. The most logical inference (and assuredly a permissible one for the district court to draw) is that Paxton raised the stakes because Talarico's ActBlue fundraising threatened Paxton's political prospects.

Paxton relatedly notes (Br.44) that "the investigation that formed the basis for the state-court claims began in February 2026," when his investigators made donations on ActBlue's platform, and he observes that the *New York Times* published its article about ActBlue's representations to Congress on April 2, 2026. It is unclear what Paxton thinks those dates prove. The timing of the February donations—beginning *one day* after Talarico announced banner fundraising results—is indeed inculpatory. And the timing of the *Times* article is irrelevant: The article said nothing about ActBlue's gift-card policies, and Paxton did not sue until weeks after it was published. App.253.

Finally, Paxton renews his contention (Br.45) that the district court "misinterpreted" his partisan statements about his Texas lawsuit. But as explained, it was wholly reasonable for the court to infer retaliatory intent from statements like Paxton's gratuitous observation that ActBlue's funds "are largely going to liberal Democrats." App.671.

C. Unable to win under established law, Paxton requests a new legal test. He argues, for the first time on appeal (Br.42-43), that ActBlue's claims fail as a matter of law unless ActBlue demonstrates that there was no probable cause for the Texas lawsuit.

Paxton forfeited this argument by failing to make it in the district court. His opposition to ActBlue's preliminary-injunction motion *accepted* this Court's settled causation standard, never asking for a no-probable-cause requirement. It mentioned such a requirement only in a "*cf.*" citation to *Hartman v. Moore*, with a parenthetical stating that plaintiffs must "plead and prove absence of probable cause for retaliatory prosecution claims." App.573. Paxton's motion to dismiss ActBlue's complaint is similar. App.403. Those oblique references did not preserve the argument that *Hartman*'s standard should apply here. It is a "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).

Paxton's argument also lacks merit. Outside of cases involving criminal prosecutions and arrests, neither this Court nor the Supreme Court has required plaintiffs bringing First Amendment retaliation claims to plead or prove an absence of probable cause. Paxton lifts the requirement from *Hartman*, which held that a plaintiff challenging a criminal prosecution as retaliatory generally must show an

absence of probable cause, 547 U.S. at 265-266, and *Nieves v. Bartlett*, which applied the same rule to retaliatory arrests, 587 U.S. at 401. But the reasoning of those decisions does not apply here.

*Hartman* turned on a causation issue "specific to retaliatory-prosecution cases" seeking damages. 547 U.S. at 259. Because prosecutors are "immune from liability for the decision to prosecute," the defendant in a retaliatory prosecution case "will be a nonprosecutor … who may have influenced the prosecutorial decision but did not himself make it." *Id.* at 262-263. The plaintiff thus must show that the non-prosecutor both "acted in retaliation" and "induced the prosecutor to bring charges that would not have been initiated without his urging." *Id.* at 262. An absence-of-probable-cause showing was necessary "to bridge the gap between the nonprosecuting government agent's motive and the prosecutor's action." *Id.* at 263.

*Nieves* is similar. Although retaliatory arrests do not involve multiple actors, they also present a distinctive causation problem: Officers must make "split-second judgments when deciding whether to arrest," and "speech is often a wholly legitimate consideration" in that calculus. 587 U.S. at 401 (quotation marks omitted). In that context, *Nieves* concluded, a no-probable-cause requirement was necessary to prevent undue second-guessing of law enforcement. *Id.* at 402.

This case presents no such complexities. Unlike in *Hartman*, this action involves one decisionmaker—Paxton—who is also the defendant. And unlike in *Nieves*, it involves no heat-of-the-moment decisions. There is therefore no basis for extending those decisions to this context.

Regardless, affirmance would be warranted even under Paxton's proffered test. Paxton's Texas lawsuit is built on the false allegation that ActBlue misrepresented its gift-card policies. *Supra* pp.26-28. And the only evidence Paxton has—his investigators' test donations—disproves his claims. There is accordingly no factual basis for the suit, much less probable cause.

D. In closing, Paxton argues (Br.47) that the district court applied the wrong causation standard even under existing law. But the court set forth the very framework Paxton urges: The plaintiff must show that "protected conduct was a substantial or motivating factor in the adverse action," at which point "[t]he burden then shifts to the defendant to prove that it would have reached the same decision" absent the protected conduct. App.672 (quotation marks omitted). Applying that standard (and referring back to its *Younger* bad-faith analysis), the court concluded that Paxton's ostensible reason for filing the Texas lawsuit—"protecting Texas consumers"—was not his actual reason and that, instead, Paxton sued to retaliate against ActBlue. App.673. All this is consistent with settled retaliation law and Paxton's conduct.

Paxton's claim of error rests on a footnote discussing *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977). App.673 n.8. It is true, as Paxton says, that this discussion focuses not on causation, but on *Mount Healthy*'s discussion of public-employee speech. *Id.* That, however, hardly shows any error in the causation analysis in the body of the court's opinion. Again, the court articulated the proper standard, analyzed ActBlue's showing, considered Paxton's responses, and found that a desire to retaliate caused Paxton's actions. App.667-672. Nothing more is required. It is also ironic for Paxton to criticize the district court for failing to ask whether Paxton had demonstrated his benign motivations "by a preponderance of the evidence," when Paxton introduced almost no evidence on that issue. Br.47.

## III. THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR RELIEF

### A. ActBlue Will Suffer Irreparable Harm Without A Preliminary Injunction

Because First Amendment harm is inherently irreparable, "irreparable injury is presumed upon a determination that" a party seeking a preliminary injunction is "likely to prevail on [its] First Amendment claim." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 11 (1st Cir. 2012) (per curiam); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976). That presumption applies here, because absent a preliminary injunction ActBlue will be forced to defend against an enforcement proceeding instituted to punish its expression, a core First

Amendment harm. And as multiple courts have held, "a showing of retaliatory or bad faith prosecution establishes irreparable injury." *Cullen*, 18 F.3d at 104; *accord Netflix*, 88 F.4th at 1099-1100.

ActBlue's political activities will also suffer without a preliminary injunction, both because of the chilling effect of the Texas lawsuit and because ActBlue will have to divert time and resources away from those activities and toward defending the suit. App.326. Particularly given the impending midterm elections, nothing can remedy that injury. *Id.* "[T]he public begins to concentrate on elections only in the weeks immediately before they are held," so there are "short timeframes in which speech can have influence." *Citizens United*, 558 U.S. at 334.

Paxton errs in contending (Br.47-48) that ActBlue faces no injury because it can raise First Amendment defenses in the Texas suit. A defendant necessarily does not "have an adequate opportunity to assert constitutional violations in the state proceeding when the prosecution *itself* is the constitutional violation." *Netflix*, 88 F.4th at 1085; *accord Media Matters*, 138 F.4th at 585. Even setting that aside, ActBlue's opportunity to raise First Amendment defenses in the Texas lawsuit is inadequate because Texas's anti-SLAPP statute—the mechanism designed for early dismissal of retaliatory suits targeting protected expression—

exempts enforcement actions and DTPA suits. Tex. Civ. Prac. & Rem. Code §27.010(a)(1), (7).

### B. The Equitable Factors Favor A Preliminary Injunction

Finally, the equitable factors support relief. Paxton has "no legitimate interest" in "a prosecution brought in bad faith or to harass." *Netflix*, 88 F.4th at 1085; *accord Cullen*, 18 F.3d at 104. And the district court's injunction does not preclude any good-faith law enforcement efforts. Conversely, ActBlue's interest in exercising its First Amendment rights free from retaliation is indisputably significant. Furthermore, Paxton's conduct hurts the public interest: ActBlue helps campaigns, causes, and donors exercise their First Amendment rights, and Paxton's actions deter and burden all that speech. Indeed, after Paxton filed suit, "donors, candidates, and organizations express[ed] concern about whether continued use of [ActBlue's] platform could subject them to investigation, public exposure, or even legal risk." App.375.

## CONCLUSION

The district court's order granting a preliminary injunction should be affirmed.

September 24, 2026

Respectfully submitted,

/s/ Daniel S. Volchok

MARK C. FLEMING
FELICIA H. ELLSWORTH
TIMOTHY J. PERLA
AMANDA MASSELAM STRACHAN
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

RONALD C. MACHEN
DANIEL S. VOLCHOK
MATTHEW T. JONES
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
daniel.volchok@wilmerhale.com

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) in that, according to the word-count feature of the word-processing system used to prepare this document (Microsoft Word for Microsoft 365), the brief contains 12,988 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f).

/s/ Daniel S. Volchok
DANIEL S. VOLCHOK

**CERTIFICATE OF SERVICE**

On this 24th day of September, 2026, I filed the foregoing using the Court's CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

/s/ Daniel S. Volchok
DANIEL S. VOLCHOK